**CAMPBELL SOUP COMPANY,**
Plaintiff,

v.

**CONAGRA, INC., Sallie Rosenthal,**
Defendants.

**Civ. A. No. 91–1084(SSB).**

United States District Court,
D. New Jersey.

Nov. 7, 1991.

David H. Pittinsky, Patrick T. Davish, Daniel H. Golub, Dilworth, Paxson, Kalish & Kauffman, Camden, N.J., for plaintiff.

Stephen M. Orlofsky, Carlo Scaramella, Blank, Rome, Comisky & McCauley, Cherry Hill, N.J., Leo A. Knowles, Patrick E. Brockhouser, Jr., McGrath, North, Mullin & Kratz, Omaha, Neb., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BROTMAN, District Judge.

Presently before the court is plaintiff Campbell's application for a preliminary injunction for misappropriation of trade secrets, breach of contract, tortious interference with a contract and breach of fiduciary duty. Campbell seeks to enjoin defendants ConAgra and Rosenthal from using and disclosing Campbell's trade secrets and other proprietary and confidential information relating to the process for making a low calorie frozen food product which has the texture, taste and appearance of fried food, but which has never been fried. Campbell also seeks to enjoin ConAgra and Rosenthal from using or exploiting a patent allegedly based on Campbell's trade secrets. Hearings were held from August 27, 1991 until September 4, 1991. After considering the evidence presented and the arguments and submissions of counsel, the court makes the following findings of fact and conclusions of law.

*Findings of Fact*

1. Plaintiff Campbell Soup Company (Campbell) is in the business of selling, manufacturing and developing food products. It markets its frozen food products under the trademarks "Swanson," "Mrs. Paul's," and "Le Menu Healthy."

2. Defendant ConAgra, Inc. (ConAgra) is in the business of selling, manufacturing and developing food products and competes with Campbell in the retail frozen food market throughout the United States. It

markets its frozen food products under the trademarks "Banquet" and "Healthy Choice."

3. Defendant Sallie Rosenthal (Rosenthal), formerly Sallie O'Brien, received a B.S. in Food Science from Cornell University in 1979, and a M.S. in Food Science from Cornell in 1981. On March 5, 1984, Campbell hired Rosenthal as a Product Development Technologist in the Poultry Product Development section of Campbell's research facility in Camden, New Jersey.

4. As a condition of her employment at Campbell, Rosenthal was required to execute a Patent–Trade Secret Agreement Relating to Inventions, Business Ideas and Trade Secrets. The Agreement prevented Rosenthal from using any trade secrets, inventions or business ideas which she conceived or to which she was exposed while working for Campbell if those ideas were used by or useful to Campbell. She was also required to keep all Campbell's trade secrets strictly confidential. The Agreement further vested Campbell with the exclusive right to all inventions and business ideas conceived by Rosenthal within one year following her termination of employment provided such inventions and ideas resulted from and related to her work for Campbell. The Agreement defined Campbell's trade secrets to include such things as recipes, manufacturing processes, research results and manufacturing layouts.

5. In the late 1970s, Campbell began an internal research and development program directed to the development of a nutritional frozen food product which was later identified as "Never Fried Chicken". In forming some of the "Never Fried Chicken" samples, Campbell's research personnel worked on and developed a product wherein skinless chicken was first injected with a phosphate solution and then coated with a predust layer. The predusted product was then covered with a batter. Next, a bread crumb mixture containing 13% encapsulated or beaded shortening and known as Japanese bread crumbs was applied. Liquid margarine or oil was then sprayed or misted onto the bread crumb mixture to form the coating of the "Never Fried Chicken." The battered and breaded product was then passed through a high temperature humidified oven or multi-purpose oven (MPO) for baking.

6. Campbell assigned Rosenthal to work on the "Never Fried Chicken" project. Rosenthal set forth formulas and procedures to be used on at least five different scale-up runs of the "Never Fried Chicken" project at Campbell's Farmington pilot plant. The process involved no frying and was intended for a product that was to be frozen after it was cooked so that the consumer could buy it in its frozen state and reheat it for consumption.

7. On June 5, 1984, Rosenthal wrote a memorandum to Campbell's marketing group identifying the following concepts at Campbell as unique:

a. the use of encapsulated fat and a margarine spray to achieve a product which had the textural attributes of fried chicken;

b. the use of an MPO or humidified oven to bake a battered and breaded chicken product which had all the flavor and textural attributes of prefried chicken without ever being fried.

8. In late 1984 or early 1985, Rosenthal engaged in discussions with an executive recruiter regarding potential career opportunities at ConAgra. During her discussions with ConAgra, Rosenthal disclosed that she was currently engaged in new product development on new frozen poultry products for Campbell. On Friday, February 22, 1985, Rosenthal traveled to St. Louis to interview with ConAgra. After arriving in St. Louis, Rosenthal completed a formal application for ConAgra in which she falsely represented that she had no "currently effective agreement with employers or others concerning inventions [she had] made or [might] make" in the future. By letter dated February 25, 1985, ConAgra extended Rosenthal a formal written offer for the position of Food Technologist. In late February, 1985, Rosenthal knew that the position she had been offered at ConAgra involved new poultry product development for its Banquet frozen foods division.

9. Rosenthal resigned from Campbell on March 4, 1985, the same day that she accepted a position at ConAgra as a Food Technologist in the Research & Development Department with principal responsibility in the poultry unit. When an employee involved in research announced that he or she would be leaving to work for a competitor, it was Campbell's policy thereafter to exclude that employee from Campbell's research facilities. In keeping with this policy, Campbell personnel promptly informed Rosenthal that March 4, 1985 would be her last day and Rosenthal thereafter ceased working for Campbell. She started working for ConAgra on March 12, 1985.

10. Campbell took substantial measures to safeguard the confidentiality of proprietary information relating to its "Never Fried Chicken" product. Upon commencement of employment, Campbell provided all employees working on or exposed to the "Never Fried Chicken" technology with a lockable desk and a corresponding key and instructed such employees to keep all research documents in the desk under lock and key. Campbell's research facilities in Camden and Farmington were secured from the public so that outsiders could enter Campbell's research premises only after signing a register, obtaining a pass and only under the escort of a Campbell employee.

11. Prior to Rosenthal's employment with either Campbell or ConAgra, many companies in the food industry tried to develop a chicken product which was not fully fried but which tasted like chicken that had been fried. These efforts included those of General Foods with its "Shake–N–Bake" and "Oven Fry" products which had been underway for approximately twenty years.

12. It is common to incorporate beaded shortening in bread crumbs to coat poultry products. Crumbs containing beaded shortening were generally available before, during and after Rosenthal's employ with Campbell.

13. The application of edible oil to a baked product in either a mist or spray form has been a widely known practice in the baking industry since the 1970's. Modern Maid Food Products, Inc. described this process of spraying oil on a breaded product in a 1981 memo to Campbell.

14. A multi-purpose oven, or MPO, is a type of humidified oven which has been in general use since the early 1980's by food processors.

15. By letters dated April 25, 1985, Campbell notified ConAgra and Rosenthal of Rosenthal's Agreement with Campbell pertaining to inventions, business ideas and trade secrets. Campbell provided ConAgra with a copy of the Agreement and informed ConAgra that Rosenthal had worked on several enumerated projects including Campbell's non-fried chicken project, wherein she was made privy to Campbell's trade secrets. None of Rosenthal's supervisors at ConAgra made any inquiry of Rosenthal concerning her non-fried chicken work at Campbell.

16. By letter dated June 3, 1985, ConAgra responded to Campbell's letter stating that it was not interested in acquiring any trade secrets belonging to Campbell. Rosenthal does not recall reviewing or even being requested to review ConAgra's June 3, 1985 letter, nor does she recall being questioned by anyone representing ConAgra on the subject thereof.

17. For roughly a year prior to Rosenthal's employment with ConAgra, ConAgra had worked on a new line of nutritional chicken products, which it termed "Project Nova." As part of this project in 1984, ConAgra considered introducing a premium quality frozen chicken that was baked not fried.

18. As part of these efforts, ConAgra experimented with prototypes of an oven-fried chicken employing "Oven Fry," a breading product manufactured by General Foods. David Scherpf, the head of Research and Development for Banquet Foods both before and after Rosenthal's employment, was a former General Foods executive and had responsibility for the "Shake–N–Bake" and "Oven Fry" products.

19. Prior to Rosenthal's arrival at ConAgra, ConAgra had not attempted to use a bread crumb mixture which included encapsulated or breaded shortening to form the coating of its "Project Nova" chicken product. ConAgra also did not use sprayed or misted vegetable oil or margarine on the coating of its "Project Nova" chicken product.

20. In an interoffice memorandum dated March 18, 1985, ConAgra's Ron Wesley, who was then the researcher in charge of ConAgra's "Project Nova" chicken product, described the status of the project. The three cooking methods described in Wesley's memorandum all involved frying. The memorandum did not discuss the use of a high temperature humidified oven or MPO–type oven to bake a skinless chicken product which has been injected with a phosphate solution, predusted, battered and breaded. It also failed to show the use of a bread crumb mixture containing 13% beaded shortening or encapsulated fat or the use of sprayed or misted oil applied to the bread crumb mixture to form the coating of non-fried chicken product.

21. Within two months after arriving at ConAgra, Rosenthal developed a process which allowed ConAgra to eliminate all frying from its "Project Nova" chicken product. Her procedure for making a frozen non-fried chicken product included the following steps: 1) skinless chicken was injected with a phosphate solution; 2) the injected chicken was coated with a predust mixture; 3) the predusted product was covered with batter; 4) the battered product was covered by a bread crumb mixture containing Japanese and extruded bread crumbs containing 13% encapsulated or beaded shortening; 5) the bread crumb mixture was sprayed with vegetable oil to form the coating; 6) the battered and breaded product was then baked in a high temperature humidified oven; and 7) the product is subjected to surface browning in a browning oven.

22. The use of extruded crumbs or crumbs manufactured from extruded flour is a widespread practice which preceded Rosenthal's employment with either Campbell or ConAgra. Before Rosenthal came to ConAgra, ConAgra also used extruded crumbs on chicken products that were not fully fried. The extruded and Japanese bread crumb mixture used by Rosenthal at ConAgra contained 13% encapsulated or beaded shortening, the same amount of shortening used at Campbell.

23. On a work-related assignment for ConAgra, Rosenthal was exposed to the use of a browning unit on her trip to Heat and Control, Inc. in San Francisco in April, 1985. Campbell had previously achieved a dark appearance on its poultry products by using double toasted or pre-browned bread crumbs.

24. On June 20, 1985, ConAgra assigned "TOP SECRET" status to its "Nova Chicken" project. In a memorandum to those employees involved in the project, ConAgra stated that there were "several major competitors that could potentially preempt our entry into the market. One proprietary conversation over-heard on an airplane or in the mens room . . . could end up costing us millions on the bottom line. Please make this a top priority."

25. As of May, 1985, ConAgra did not have either a pilot plant or a pilot size MPO oven which could be used to test the "Project Nova" chicken prototypes. On May 24, 1985, Rosenthal addressed a memorandum to her superiors at ConAgra advocating that such a pilot plant line be installed at ConAgra's research facility. She stated that the pilot plant line could be used initially to further develop and refine "Project Nova." In connection with that memorandum, Rosenthal disclosed to her superiors at ConAgra that Campbell had a pilot production line. ConAgra adopted Rosenthal's recommendations and in late 1985 installed a pilot plant line including a pilot size MPO in ConAgra's Batesville research facility. Rosenthal used the Batesville pilot line to run scale-up tests of the "Project Nova" chicken product.

26. On July 7, 1986, Rosenthal and ConAgra filed a patent application with the United States Patent and Trademark Office entitled "Bread Crumb Coating Composition And Process For Imparting Fried–Like

Flavor And Texture To Food Products" (The '438 patent). The invention disclosed by Rosenthal in her patent application was for a non-fried food product which after being frozen and reheated had the flavor and texture associated with fried foods, but lacked the fat and calories associated with such products.

27. Included with her patent application was a declaration, signed by Rosenthal attesting that she was the first, original and sole inventor of the subject matter claimed in the patent application. Rosenthal assigned her rights in the patent application to ConAgra.

28. The patent application provides specific formulas and tolerances for the various steps in the patented process. In general terms, the patent application covers a process whereby: 1) skinless chicken is injected with a phosphate solution; 2) the chicken is coated with a predust layer; 3) the predusted product is covered with a batter; 4) the battered product is coated with a bread crumb mixture which could include extruded and/or Japanese crumbs; 5) the battered and breaded product is baked in a high temperature humidified oven; 6) the battered and breaded chicken is sprayed with vegetable oil; 7) the product is subjected to surface browning at 700 to 900 degrees Fahrenheit; and 8) the product is frozen.

29. On July 24, 1990, Rosenthal received the '438 patent. The Patent Office previously had rejected Rosenthal's patent application on or about March 26, 1987, December 17, 1987 and August 22, 1988. The '438 patent identified Rosenthal as the sole inventor and issued directly to ConAgra as assignee.

30. Many patents involve similar processes and many of the same components as the '438 Patent as well as those associated with Campbell's attempted development of a "Never Fried Chicken" product. These earlier processes involved the application of oil through a spray method as well as the incorporation of solid fat in particle form to the breading or product coating for the purpose of achieving fried-like qualities in a baked product. None of these prior patents disclose a freezable and reheatable never fried food product.

31. After Rosenthal resigned from Campbell, Campbell continued to develop and refine its "Never Fried Chicken" process always returning to the original process utilized by Campbell at the time that Rosenthal was a Campbell employee. In 1988, Allan Samson of Campbell's Mrs. Paul's division began working toward the development of a non-fried fish product. Samson's fish product built upon the work performed by Rosenthal and others at Campbell relating to the "Never Fried Chicken" product. Subsequently, Samson has continued Campbell's development of its "Never Fried Chicken" product. The process Samson is currently using for the "Never Fried Chicken" product is virtually identical to that used by Rosenthal while employed at Campbell.

*Conclusions of Law*

To obtain a preliminary injunction, the movant must produce evidence sufficient to convince the court that the following four factors favor preliminary relief: 1) the movant's likelihood of prevailing on the merits after a trial; 2) the extent to which the movant is being irreparably harmed by the alleged conduct; 3) the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued; and 4) the public interest. *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 191–192 (3d Cir. 1990). "The grant of injunctive relief is an extraordinary remedy which should be granted only in limited circumstances." *Frank's GMC Truck Center v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988).

## A. LIKELIHOOD OF PREVAILING ON THE MERITS

### 1. Misappropriation of Trade Secrets

In order to prove a claim for misappropriation of trade secrets, the plaintiff has the burden of proving:

1) the existence of a trade secret; 2) communicated in confidence by the plaintiff to the employee; 3) disclosed by the

employee in breach of that confidence; 4) acquired by the competitor with knowledge of the breach of confidence; and 5) used by the competitor to the detriment of the plaintiff.

*Rohm and Haas Co. v. Adco Chemical Co.,* 689 F.2d 424, 429–430 (3d Cir.1982). ▮▮▮ The New Jersey Supreme Court has adopted the definition of a trade secret from comment b to § 757 of the *First Restatement of Torts:*

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.

*Ingersoll Rand Co. v. Ciavatta,* 110 N.J. 609, 636, 542 A.2d 879, 893 (1988). "[E]ven though each and every element of plaintiff's Process is known to the industry, the combination of those elements may be a trade secret if it produces a product superior to that of competitors." *Rohm & Haas,* 689 F.2d at 433. *Sun Dial Corp. v. Rideout,* 16 N.J. 252, 108 A.2d 442, 445–446 (1954).

The *First Restatement of Torts,* Section 757, lists six factors for determining whether a given process or information is a trade secret. They are:

1) the extent to which the information is known outside of the business; 2) the extent to which it is known by employees and others involved in the business; 3) the extent of measures taken by the owner to guard the secrecy of the information; 4) the value of the information to the business and to its competitors; 5) the amount of effort or money expended in developing the information; and 6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Ingersoll Rand,* 110 N.J. at 637, 542 A.2d at 893 (quoting *First Restatement of Torts* § 757 comment b).

Campbell admits that several of the individual elements of Campbell's process were generally known in the industry and were not trade secrets. Dr. Stadelman, Campbell's expert witness, stated that the use of a bread crumb mixture containing encapsulated shortening, an oil applied to the bread crumb mixture in either a mist or spray form, and a humidified oven were generally known in the industry. Transcript at 370–371. Campbell argues that it is the entire process for making a non-fried chicken product, the combination of the steps in the process, which is a trade secret belonging to Campbell. It relies on the *Restatement* factors to prove its claim of trade secret status.

Campbell satisfies the first factor of the *Restatement,* the extent the information is known outside of the business. Campbell relies upon Rosenthal's June 5, 1984 internal Campbell memo and her representations to the Patent and Trademark Office. In her internal memo, Rosenthal describes the use of a bread crumb mixture with encapsulated fat, sprayed or misted liquid margarine, and a humidified oven as *"unique technical aspects"* (emphasis added) of the "Never Fried Chicken" process.

Rosenthal's representations to the Patent and Trademark Office in her patent application also indicate that the process developed by Campbell and used by Rosenthal at ConAgra was not known by others in the industry. She represented to the Patent and Trademark Office that, with the exception of a few patents, she was aware of no prior art, including prior known uses of food coatings and breadings, which would be relevant to her patent application. None of the prior patents which Rosenthal cited disclosed a freezable and reheatable non-fried food.

The two modifications added by Rosenthal to the process developed at Campbell do not lessen the protection that should be accorded to Campbell's proprietary information. The use of a mixture of Japanese and extruded crumbs is a minor modification. Rosenthal's patent application permitted the use of any combination of extruded and Japanese bread crumbs. It is significant that regardless of this combination, the bread crumb mixture utilized by Rosenthal still contained 13% encapsulated or beaded shortening, a concept which Ro-

senthal learned while she was still at Campbell. The use of a browning oven was also a minor modification. Campbell had previously achieved a dark appearance by using double toasted or pre-browned bread crumbs.

Campbell contends that it sufficiently met the second and third *Restatement* factors, the extent the information is known by employees and others involved in the business and the extent of measures taken by the owner to guard the secrecy of the information. The court agrees. Campbell required Rosenthal to execute an Agreement with respect to trade secrets belonging to Campbell. Moreover, all Campbell employees working on or exposed to the "Never Fried Chicken" technology were provided with a lockable desk and a corresponding key and were instructed to keep all research documents in the desk under lock and key. Campbell's research facilities in Camden and Farmington were also secured from the public so that outsiders could only enter Campbell's research premises after signing a register, obtaining a pass and under the escort of a Campbell employee.

When Rosenthal informed Campbell that she would be leaving to work for a competitor, Campbell excluded Rosenthal from its research facilities. Campbell also put ConAgra on notice of Rosenthal's confidentiality obligations vis-a-vis the Patent–Trade Secret Agreement and informed ConAgra that Rosenthal had worked on Campbell's non-fried chicken product. ConAgra never questioned Rosenthal about the trade secrets she learned at Campbell. Despite its failure to make any inquiry into the subject, ConAgra responded to Campbell's notification letter that it was not interested in inquiring any trade secrets of Campbell. To promote an atmosphere of commercial morality and fairness, the court believes that ConAgra, with the knowledge it possessed with respect to Rosenthal's background and duties at Campbell, should have questioned Rosenthal regarding the notice letter sent by Campbell.

The fourth *Restatement* factor concerns the value of the information to the plaintiff and its competitors. Campbell has also satisfied this factor. The fact that ConAgra received the '438 patent is proof of the value of Campbell's "Never Fried Chicken" process and the combination of its elements. Further, ConAgra treated its non-fried chicken product as a trade secret as indicated in a June 20, 1985 memorandum in which ConAgra assigned a "TOP SECRET" status to its "Project Nova" chicken product.

After Rosenthal resigned from Campbell, Campbell continued to develop and refine its "Never Fried Chicken" technology. In 1988, Allan Samson of Campbell's Mrs. Paul's division began working toward the development of non-fried fish product based upon the work performed by Rosenthal and others at Campbell relating to the "Never Fried Chicken" process.

The fifth *Restatement* factor, the amount of effort or money expended in developing the information also leads the court to hold that Campbell's trade secret claim has merit. Rosenthal was hired to work on the design, development and testing of the "Never Fried Chicken" product. She began working on the process soon after she arrived. Moreover, Campbell conducted an extensive series of tests on the formula and procedure involved with the "Never Fried Chicken" product including five scale-up runs in its Farmington research facility.

The final factor of the *Restatement* test, the ease or difficulty with which the process could be acquired or duplicated by others, also favors Campbell. Prior to Rosenthal's arrival, ConAgra had not used a humidified oven, a bread crumb mixture which included encapsulated or beaded shortening or sprayed or misted vegetable oil as part of the "Never Fried Chicken" process. Once Rosenthal arrived at ConAgra, ConAgra used these steps to create a non-fried chicken product. There is no proof that ConAgra was able to eliminate frying from its "Project Nova" chicken before Rosenthal started working for them.

In addition to proving the existence of its trade secrets, Campbell has produced evidence demonstrating every other element

of its misappropriation of trade secrets claim. Campbell's trade secrets were communicated in confidence by Campbell to Rosenthal and Rosenthal disclosed Campbell's trade secrets to ConAgra in breach of that confidence. The various measures taken by Campbell to protect its proprietary information and the explicit language of the Patent–Trade Secret Agreement requiring Rosenthal to keep all of Campbell's trade secrets strictly confidential are proof of this.

Although, there is no direct evidence indicating that trade secrets were acquired by ConAgra with knowledge of Rosenthal's breach of confidence, Campbell has produced sufficient evidence to convince the court that ConAgra did know or should have known of Rosenthal's breach of confidence. ConAgra knew that Rosenthal was working on frozen poultry products for Campbell. She was immediately assigned to work on ConAgra's frozen poultry products. After receiving Campbell's April 23, 1985 notification letter, ConAgra did not question Rosenthal concerning her nonfried chicken work for Campbell. Moreover, Rosenthal was not asked to review ConAgra's June 3, 1985 response to Campbell's notification letter.

ConAgra also used Campbell's process to the detriment of Campbell. ConAgra, a direct competitor of Campbell's and Rosenthal patented a process for making a nonfried chicken product, a process which was developed at Campbell and which also belonged to Campbell.

For these reasons, the court holds that Campbell has met its burden in proving likelihood of prevailing on the merits on its claim that its process for making a nonfried food product is a trade secret and that ConAgra and Rosenthal misappropriated it.

## 2. Breach of Contract

Campbell contends that Rosenthal breached the Patent–Trade Secret Agreement she signed as a condition of employment with Campbell. Since the court has already held that Campbell has met its burden in proving that it is likely to prevail on the merits on its misappropriation of trade secrets claim, the court holds that Campbell has met its burden in proving that Rosenthal breached the agreement to the extent it required her to keep all trade secrets strictly confidential.

The court will now focus on the holdover provisions of the Patent–Trade Secret Agreement. It provided that any inventions or ideas that Rosenthal shall conceive within one year after her employment at Campbell shall be Campbell's property "if they result from and relate" to her work at Campbell. Even if Campbell made no use of them, Rosenthal was also required to disclose immediately all such inventions and ideas to Campbell.

A holdover provision will not be enforced unless it "protects the legitimate interests of the employer, imposes no undue hardship on the employee and is not injurious to the public." *Ingersoll Rand,* 110 N.J. at 628, 542 A.2d at 888. The protection afforded by holdover provisions may include information that is not "a trade secret or proprietary information, but highly specialized, current information not generally known in the industry, created and stimulated by the research environment furnished by the employer, to which the employee has been 'exposed' and 'enriched' solely due to his employment." *Id.,* 110 N.J. at 638, 542 A.2d at 894.

The court finds that the holdover clause is enforceable. It protects the legitimate interests of Campbell in that it vests a proprietary interest in Campbell for only those ideas and inventions which are conceived by Rosenthal "if they result from and relate to" her work for Campbell. The holdover clause imposes no undue hardship on Rosenthal since she is free to work for whomever she desires. It only requires her to turn over ideas and inventions which she would not have created or discovered but for her affiliation with Campbell and only for a year after her termination of employment with Campbell. Finally, the holdover clause is not injurious to the public since the "public has a clear interest in safeguarding fair commercial practices and in protecting employers from theft or pira-

cy of trade secrets, confidential information, or, more generally, knowledge and technique in which the employer may be said to have a proprietary interest." *Id.*, 110 N.J. at 639, 542 A.2d at 894.

█ Campbell contends that the use of Japanese and extruded crumbs in the bread crumb mixture and the use of a browning oven after the MPO baking step were inventions and business ideas conceived by Rosenthal within one year after her termination from Campbell and resulted from and related to her work for Campbell. Accordingly, Campbell argues, these modifications belong to Campbell.

The court disagrees with this analysis. Dr. Stadelman, Campbell's expert witness, testified that any person, regardless of what company they previously worked for, would discover the use of extruded crumbs after having worked with Japanese crumbs. Transcript at 359–360. The use of extruded bread crumbs was known generally in the industry and did not result from and relate to Rosenthal's work at Campbell nor was it information to which she was exposed or by which she was enriched solely due to her employment at Campbell.

Likewise, Campbell presents no evidence that Rosenthal's use of a browning unit resulted from or related to her employment at Campbell. Campbell contends that both a humidified oven and a browning oven function similarly in that both circulate hot air in the direction of the food product being cooked and differ only to the extent that higher air velocities and temperatures can be achieved with a browning unit. These similarities do not convince the court that Rosenthal's use of a browning oven was based on her work at Campbell. Campbell never claims that it used a browning unit as part of its "Never Fried Chicken" process or in any of its other processes but only that it had previously achieved a dark appearance by using double toasted or pre-browned bread crumbs. Moreover, from the evidence adduced, Campbell has not contradicted the claim that Rosenthal was first exposed to the use of a browning unit as an employee of Con-

Agra while on a work-related trip to Heat and Control, Inc. in San Francisco in April, 1985.

### 3. Tortious Interference with a Contract

█ In order to prevail on its claim that ConAgra tortiously interfered with the Patent–Trade Secret Agreement between Campbell and Rosenthal, Campbell must prove that ConAgra actually interfered with the employment relationship between Campbell and Rosenthal and that ConAgra did so with malice. *Welter v. Seton Hall University*, 243 N.J.Super. 263, 278–279, 579 A.2d 332, 340 (App.Div.1990). "Malice" constitutes the intentional doing of a wrongful act without justification or excuse. *Labus v. Navistar Intern. Transp. Corp.*, 740 F.Supp. 1053, 1063–1064 (D.N.J. 1990). Moreover, Campbell must prove that it was damaged by the malicious interference. *Norwood Easthill Assoc. v. Norwood Easthill Watch*, 222 N.J.Super. 378, 384–385, 536 A.2d 1317, 1319–1321 (App. Div.1988).

█ Campbell asserts that because ConAgra was notified, on or about April 25, 1985, of the Patent–Trade Secret Agreement and Rosenthal's work on Campbell's non-fried chicken product, ConAgra interfered with the Patent–Trade Agreement maliciously and without justification. Campbell has met its burden of proving that it is likely to prevail on the merits. ConAgra hired Rosenthal with full knowledge of her background at Campbell and put her to work on a very similar product on which she focused at Campbell. ConAgra did this even after being explicitly notified on or about April 25, 1985 of Rosenthal's agreement with Campbell and that Rosenthal had been working on Campbell's non-fried chicken product.

It also follows that Campbell was damaged by ConAgra's interference with the relationship between Campbell and Rosenthal as represented in their Patent–Trade Secret Agreement. If trade secrets were misappropriated, Campbell suffers to the extent that ConAgra—and other competitors because of public knowledge of

the '438 patent—are able to benefit from Campbell's proprietary information. Moreover, Campbell has presented evidence indicating that ConAgra acted without justification or excuse in allowing Rosenthal to work on its "Project Nova" chicken product. As discussed *supra*, the court believes that given ConAgra's knowledge of Rosenthal's background and duties at Campbell, it should have questioned Rosenthal regarding the notice letter sent by Campbell with respect to Campbell's trade secrets before allowing Rosenthal to continue working on the "Project Nova" chicken product. This questioning could have been done in such a manner as not to elicit responses disclosing specific trade secret information.

### 4. Breach of Fiduciary Duty

"An employee owes a duty of loyalty to the employer and must not, *while employed,* act contrary to the employer's interest." *Chernow v. Reyes,* 239 N.J.Super. 201, 204, 570 A.2d 1282 (App.Div.1990) (emphasis added); *Auxton Computer Enterprises v. Parker,* 174 N.J.Super. 418, 423–425, 416 A.2d 952, 955 (App.Div.1980). Campbell contends that Rosenthal's actions in misappropriating Campbell's trade secrets and confidential proprietary information constitute a breach of the fiduciary duty she owed Campbell. Because the alleged misbehavior took place after Rosenthal's employment with Campbell was terminated, Campbell has not met its burden of proving likelihood of prevailing on the merits on its claim of breach of fiduciary duty.

### B. IRREPARABLE HARM TO THE PLAINTIFFS

To prove irreparable harm, Campbell must produce sufficient evidence demonstrating potential harm which cannot be redressed by a remedy following a trial. *Instant Air Freight Co. v. C.F. Air Freight,* 882 F.2d 797, 801 (3d Cir.1989). "The preliminary injunction must be the only way of protecting the plaintiff from harm." *Id.* As the Supreme Court commented, "[t]he key word in this consideration is irreparable.... The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1964). Moreover, the requisite for injunctive relief requires a "clear showing of immediate irreparable harm" or a "presently existing actual threat." *SI Handling Sys. v. Heisley,* 753 F.2d 1244, 1264 (3d Cir.1985); *Continental Group Inc. v. Amoco Chem. Corp.,* 614 F.2d 351, 359 (3d Cir.1980).

Campbell contends that it will suffer irreparable harm if ConAgra and Rosenthal are not preliminarily enjoined from using and disclosing Campbell's trade secrets and other confidential and proprietary information relating to Campbell's frozen food technology. The court agrees. In the '438 patent, ConAgra and Rosenthal have already disclosed to the public Campbell's trade secrets and proprietary information. ConAgra's and Rosenthal's further use of Campbell's proprietary frozen poultry technology will lead to more irreparable harm. A clear showing of immediate irreparable harm is met since the '438 patent gives ConAgra the exclusive rights to utilize the process developed at Campbell to Campbell's detriment.

### C. IRREPARABLE HARM TO THE DEFENDANTS IF RELIEF IS GRANTED

Campbell argues that its right to the use and protection of its trade secrets and proprietary information clearly outweighs any infringement of ConAgra's business or Rosenthal's livelihood. Campbell is correct. Because Campbell does not seek to restrain Rosenthal from working at ConAgra and since ConAgra's "Project Nova" non-fried chicken process and its '438 patent are based on Campbell's proprietary information, ConAgra and Rosenthal will not be irreparably harmed if they are enjoined.

### D. PUBLIC INTEREST

In the Third Circuit, it is not necessary for a district court to engage in ex-

tended analysis of the public interest where the elements of a trade secret claim have been established. *SI Handling Systems*, 753 F.2d at 1265. Campbell maintains that since the elements of a trade secret have been established, the entry of an injunction is plainly in the public interest. The court agrees.

*Conclusion*

For the foregoing reasons, the court grants Campbell's request for a preliminary injunction. An appropriate order will be entered.

### ORDER FOR PRELIMINARY INJUNCTION

This matter having come before the court on plaintiff's application for preliminary injunctive relief enjoining defendants from using and disclosing plaintiff's trade secrets and other confidential and proprietary information; and

The court having considered the submissions of the parties and the arguments of counsel; and

For the reasons set forth in the court's opinion of this date;

IT IS on this 5th day of November, 1991, hereby ORDERED:

1. Plaintiff's application for preliminary injunctive relief will be GRANTED;

2. Defendants are hereby enjoined from using or exploiting the '438 patent in any way whatsoever including, but not by way of limitation, the marketing, licensing or selling of any product based upon the '438 patent;

3. Defendants are further enjoined from using the following process to research, market or sell any non-fried frozen food product:

1) injecting skinless chicken with a phosphate solution;

2) predusting the injected chicken;

3) battering the predusted product;

4) applying a bread crumb mixture with encapsulated fat or breaded shortening to the battered product;

5) spraying or misting the battered and breaded chicken with vegetable oil; and

6) baking the battered and breaded product in a high temperature humidified oven.