## MARSELLIS–WARNER CORP., Plaintiff,

v.

## Charles RABENS, et al., Defendants.

### No. 98–4384 (AJL).

United States District Court, D. New Jersey.

Feb. 24, 1999.

Michael M. Rosenbaum, Brian E. Bragg, Budd Larner Gross Rosenbaum, Greenberg & Sade, Short Hills, NJ, for plaintiff Marsellis–Warner Corp.

James M. McGovern, Jr., Keith B. Bannach, Lomurro, Davison, Eastman & Munoz, P.A., Paragon Corporate Park, Freehold, NJ, for defendant Jack Fernandez.

Robert S. Bonney, Evans Osborne Kreizman & Bonney, Ocean, NJ, for defendants Patricia Fernandez and Paul and Marc Construction, Inc.

Henry First, West Orange, NJ, for Charles Rabens.

## OPINION

LECHNER, District Judge.

This is an action brought by plaintiff, Marsellis–Warner Corp. ("Marsellis–Warner"), against Charles Rabens ("Rabens"), Jack Fernandez ("Jack Fernandez"), Patricia Fernandez ("Patricia Fernandez"), Paul and Marc Construction, Inc. ("PAM Co."), and John Does # 1–20 and ABC Corp.–XYZ Corp. (collectively, the "Defendants").[1] In a verified complaint filed 21 September 1998, (the "Complaint"), Marsellis–Warner seeks money damages and equitable relief for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1964(c) and 1962(c), and for various state law violations, including fraud, breach of contract, fraudulent misrepresentation, conversion, conspiracy, unjust enrichment, breach of fiduciary duty and state RICO violations. Jurisdiction is alleged pursuant to 18 U.S.C. § 1964(c), 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).

Currently before the court is an application by Marsellis–Warner for a preliminary injunction (the "Preliminary Injunction Application") to enjoin the Defendants from dissipating or disposing of any assets. The Preliminary Injunction Application is brought pursuant to the New Jersey Racketeering Act, N.J.S.A. 2C:41–4 ("Section 2C:41–4") and Fed.R.Civ.P. 65 ("Rule 65"). Marsellis–Warner also requests a writ of attachment (the "Attachment Request") against the assets of the Defendants which are located in New Jersey, pursuant to Fed.R.Civ.P. 64 ("Rule 64") and N.J.S.A. 2A:26–2 ("Section 2A:26–2").[2]

---

1. At a hearing held on 23 February 1999, (the "23 February 1999 Hearing") the parties indicated a settlement agreement-in-principal had been reached with Rabens individually. For purposes of this opinion, however, Rabens, along with Jack Fernandez, Patricia Fernandez and PAM Co., are referred to collectively as the "Defendants." Because it appears Rabens has satisfied any financial obligations owed to Marsellis–Warner, he is not subject to the preliminary injunction described herein and in the accompanying order insofar as it seeks to restrain the dissipation and/or transfer of assets unrelated to the litigation.

2. In support of the Preliminary Injunction Application and Attachment Request, Marsellis–Warner submitted:
(1) "Memorandum of Law in Support of Plaintiff's Order to Show Cause for a Writ of Attachment, Preliminary Injunction and Expedited Discovery," (the "Preliminary Injunction Moving Brief"), attaching Exhibits A through F;
(2) "Reply Memorandum of Law in Further Support of Plaintiff's Application for a Writ of Attachment and a Preliminary Injunction," (the "Preliminary Injunction Reply Brief");
(3) Affidavit of Andrew Amsterdam (the "Amsterdam Aff."), attaching Exhibit A; Affidavit of Mark Bennett (the "Bennett Aff."), attach-

Also pending is a motion by the Defendants to stay the instant civil action pending completion of a Federal criminal investigation into the conduct of the Defendants (the "Motion to Stay").[3]

For the reasons set forth below, the Preliminary Injunction Application is granted; the Attachment Request is denied; the Motion to Stay is denied without prejudice.[4]

## Background

### A. Procedural History

As mentioned, Marsellis–Warner filed the Complaint commencing this action on 21 September 1998. *See* Complaint. On the same date, Marsellis–Warner, seeking temporary restraints against the Defendants, applied *ex parte* for an order to show cause (the *"Ex Parte* Application"). On 22 September 1998, Judge William Bassler issued an order to show cause (the

---

ing Exhibit A; Affidavit of Adeel Malik (the "Malik Aff."); Affidavit of Philip J. Pirro (the "Pirro Aff."); Affidavit of Robert Shockley (the "Shockley Aff."); Supplemental Affidavit of Andrew Amsterdam (the "Supplemental Amsterdam Aff."), attaching Exhibits A through I; and Affidavit of John McSwain (the "9 November 1998 McSwain Aff.").

In opposition to the Preliminary Injunction Application and Attachment Request, the Defendants jointly submitted:
(1) "Memorandum of Law Submitted Jointly by All Defendants in Opposition to Plaintiff's Request for a Writ of Attachment, Preliminary Injunction, and Expedited Discovery," (the "Preliminary Injunction Opposition Brief");
(2) Affidavit of James M. McGovern, Jr., dated 21 October 1998, (the "21 October 1998 McGovern Aff."), attaching unnotarized affidavits of Eric Strucke, Michael DiGirolamo, Carmen Centimole, Terry Hurley, Michael Cackowski and John McSwain (the "19 October 1998 McSwain Aff.");
(3) Affidavit of James M. McGovern, Jr., dated 23 November 1998, (the "23 November 1998 McGovern Aff."), attaching notarized affidavits of Eric Strucke (the "Strucke Aff."), Michael DiGirolamo (the "DiGirolamo Aff."), Carmen Centimole (the "Centimole Aff."), Terry Hurley (the "Hurley Aff.") and Michael Cackowski (the "Cackowski Aff.");
(4) Affidavit of Martin Assuncao, Jr. (the "Assuncao Aff."); Affidavit of Sandra Rabens (the "Rabens Aff."), attaching Exhibits One through Five; Affidavit of Henry Furst, Esq. (the "Furst Aff."), attaching redacted versions of Bennett Aff. and Amsterdam Aff.; Affidavit of Raymond Sergeant (the "Sergeant Aff."); Affidavit of Robert K. McGreevy (the "McGreevy Aff.")
(5) "Defendants' Rebuttal Brief Pursuant to Court Order of November 24, 1998" (the "Defendants' Rebuttal Brief"); and
(6) Declaration of Robert K. McGreevy (the "McGreevy Decl."); Declaration of Elaine Simone (the "Simone Decl."); Declaration of Nancy Vliet (the "Vliet Decl."); Declaration of David Hocking (the "Hocking Decl."); Declaration of Raymond Sergeant (the "Ser-

geant Decl."); Declaration of Henry Furst (the "Furst Decl."); Supplemental Affidavit of Germone Fernandez (the "Supplemental Fernandez Aff."); Certification of Carmen Centimole (the "Centimole Certif."); Affidavit of Ronald A. Lotrecchio (the "Lotrecchio Aff."); Declaration of Herbey Lake (the "Lake Decl."); Supplemental Certification of Eric Strucke (the "Supplemental Strucke Certif."); Declaration of Erin Henderson (the "Henderson Decl."); Declaration of Sohna Mehra (the "Mehra Decl."); and Affidavit of Robert S. Bonney, Jr. (The "Bonney Aff.").

3. In support of the Motion to Stay, the Defendants submitted:
(1) "Defendants' Joint Brief in Support of Motion for Stay of Civil Action," (the "Stay Moving Brief");
(2) "Defendants' Joint Reply Brief in Support of Their Motion for a Limited Stay," (the "Stay Reply Brief");
(3) Affidavit of Frank Palma (the "Palma Aff."), attaching Exhibit One; Affidavit of Robert S. Bonney, Jr. (the "Bonney Aff."), attaching Exhibits One through Four; Affidavit of Donald M. Lomurro, Esq. (the "Lomurro Aff."); Affidavit of Henry F. Furst (the "Furst Aff."), attaching Exhibits.

In opposition to the Motion to Stay, Marsellis–Warner submitted:
(1) "Plaintiff's Memorandum of Law in Opposition to Defendants' Motion For a Stay," (the "Stay Opposition Brief");
(2) Affidavit of Brian E. Bragg (the "Bragg Aff."), attaching Exhibits A through C.

4. As indicated, it appears Marsellis–Warner has reached a settlement agreement-in-principal with Rabens, who presently is the target of the pending criminal investigation. In light of this development, the Motion to Stay is denied without prejudice with leave to refile for the reasons expressed on the record during the 23 February 1999 Hearing.

With respect to the preliminary injunction, at the 23 February 1999 Hearing, counsel for Jack Fernandez, Patricia Fernandez and PAM Co. expressly consented to the restraints.

"Order to Show Cause") granting the *Ex Parte* Application. *See* Order to Show Cause. The Order to Show Cause set 25 September 1998 as the date on which to hear the parties on the application of Marsellis–Warner for temporary restraints against the Defendants. *See* Order to Show Cause. The Defendants were directed to submit opposition, if any, by 25 September 1998. *See id.*

The Order to Show Cause directed the Defendants not to convert, transfer, sell or dispose of or dissipate any property or rights in property in which they possess a legal or ownership interest pending the 25 September 1998 return date. The Defendants also were directed to preserve all documents relating to the allegations set forth in the Complaint. *See* Order to Show Cause.

On 25 September 1998, Judge Bassler signed a consent order (the "25 September 1998 Consent Order"), pursuant to which the Defendants consented to the terms and provisions set forth in the Order to Show Cause. The 25 September 1998 Consent Order directed the continuance of the temporary restraints granted in the Order to Show Cause until further court order. *See* 25 September 1998 Consent Order.

Judge Bassler, thereafter, recused himself; that recusal resulted in the transfer of the instant action to the undersigned. On 6 October 1998, an order of reassignment was entered.

By consent order, signed by the undersigned and filed 5 October 1998, (the "5 October 1998 Consent Order"), the temporary restraints granted in the Order to Show Cause were continued pending further court order. A return date of 25 November 1998 was set for the Order to Show Cause. The 5 October 1998 Consent Order further provided: "Any and all affidavits supporting [moving briefs and reply briefs] shall be based solely on firsthand knowledge and shall contain no legal argument." 5 October 1998 Consent Order at ¶ 6.

Following the 5 October 1998 Consent Order, numerous briefs and affidavits were received relating to the Preliminary Injunction Application and the Motion to Stay. Several of the affidavits contained argument of both fact and law in violation of Rule 7.2(a) of the Local Rules Governing the District of New Jersey (the "Local Rules") and the 5 October 1998 Consent Order. In particular, the Supplemental Amsterdam Affidavit originally submitted by Marsellis–Warner in conjunction with the Preliminary Application Reply Brief, attached more than forty documents spread through ten exhibits presenting novel issues.

In a letter, dated 19 November 1998, (the "Defendants' 19 November 1998 Letter"), the Defendants objected to consideration of the Preliminary Injunction Application Reply Brief and the Supplemental Amsterdam Affidavit which, they contended, "present new factual assertions and issues that were not presented in [Marsellis–Warner's] original moving papers[.]" Defendants' 19 November 1998 Letter. The Defendants requested a continuance of the 25 November 1998 return date for the Order to Show Cause and an opportunity to submit a factual response to the new factual allegations of Marsellis Warner (the "Defendants' Request to Respond"). *Id.* Marsellis–Warner objected to the Defendants' Request to Respond, in a letter, dated 19 November 1998, (the "Marsellis–Warner 19 November 1998 Letter"). *See* Marsellis–Warner 19 November 1998 Letter.

By order, dated 24 November 1998, (the "24 November 1998 Order"), the 25 November 1998 return date for the Order to Show Cause was continued pending the receipt in chambers of a revised Supplemental Amsterdam Affidavit and the Defendants' Rebuttal Brief responding to the new factual allegations of Marsellis–Warner. *See* 24 November 1998 Order. The 24 November 1998 Order also directed the parties not to file additional submissions in conjunction with the Preliminary Injunc-

tion Application. *Id.* A revised Supplemental Amsterdam Affidavit and the Defendants' Rebuttal Brief subsequently were received in chambers.

The provisions of the 24 November 1998 Order notwithstanding, counsel for Marsellis–Warner submitted a letter, dated 23 December 1998, (the "Marsellis–Warner 23 December 1998 Letter") objecting, *inter alia*, to the content of the Defendants' Rebuttal Brief and accompanying affidavits. On 4 January 1999, an order to show cause was issued *sua sponte* (the "4 January 1999 Order to Show Cause"), directing counsel for Marsellis–Warner to show cause why he should not be sanctioned for submission of the Marsellis–Warner 23 December 1998 Letter. *See* 4 January 1999 Order to Show Cause.

On 11 January 1999, counsel for Marsellis–Warner submitted a letter-brief stating its position in connection with the 4 January 1999 Order to Show Cause (the "Marsellis–Warner 11 January 1999 Letter"). *See* Marsellis–Warner 11 January 1999 Letter. In a detailed order, dated 27 January 1999, (the "27 January 1999 Order"), it was observed the Marsellis–Warner 23 December 1998 Letter and the Marsellis–Warner 11 January 1999 Letter violated the 24 November 1998 Order and the 5 October 1998 Consent Order, as well as Local Rule 7.1(f), Appendix N. *See* 27 January 1999 Order. Counsel for Marsellis–Warner was sanctioned in the amount of $250.00. *Id.*

By order, dated 11 January 1999, (the "11 January 1999 Order"), the return date on which to hear to Preliminary Injunction Application and Motion to Stay was extended. *See* 11 January 1999 Order. The 11 January 1999 Order also affirmed an order by Magistrate Judge Dennis M. Cavanaugh, dated 17 December 1998, which denied in part the application of Marsellis–Warner to compel discovery and imposed a stay of discovery (the "Discovery Stay") pending the resolution of the Motion to Stay. *See* 11 January 1999 Order.

As mentioned, a hearing was held on 23 February 1999 to address the Preliminary Injunction Application and the Motion to Stay. During the 23 February 1999 Hearing, Marsellis–Warner stated it had reached a settlement agreement-in-principal with Rabens. The parties subsequently were directed to re-brief the issues relevant to the Motion to Stay. Counsel for Jack Fernandez, Patricia Fernandez and PAM Co. also consented to the restraints proposed in the Preliminary Injunction Application.

### B. *Facts*

#### 1. *The Parties*

Marsellis–Warner is a paving and excavating contractor which performs work generally for governmental agencies and Fortune 500 companies. *See* Complaint at ¶ 1. Rabens and Jack Fernandez were employed by Marsellis–Warner as executive vice president and foreman for more than twenty years. *See id.* at ¶¶ 1, 5, 6. During the course of their employment, Rabens and Jack Fernandez were given full responsibility, authority and discretion to operate a satellite office of Marsellis–Warner located in Morganville, New Jersey (the "South Jersey Office"). *See id.* at ¶ 1. At the South Jersey Office, Rabens, as executive in charge, supervised the work of Jack Fernandez. Patricia Fernandez, the wife of Jack Fernandez, was at all relevant times the co-owner of PAM Co., a construction company. *See* Complaint at ¶ 7. Rabens and Jack Fernandez also had an ownership interest in PAM Co. *Id.*

Under the billing system of Marsellis–Warner, Jack Fernandez was responsible for submitting a "daily work report" or "timesheet" to the principal office of Marsellis–Warner describing particular work performed on projects for clients of Marsellis–Warner. The daily work report detailed the project name, the work to be performed at the project, the hours worked by laborers on that particular day at the project, the hours worked by the operating engineers on that day at the

project, the type of equipment used on the project on that day, the length of time such equipment was in use on that day, the names of the trucking companies and other subcontractors who were utilized on that day, the number of hours spent by each truck hired for the project, the type of materials required for each project on that day, the number of tons of each material used and the name of the supplier of each material for that particular day. Based upon these daily work reports, Marsellis–Warner made payments to the Defendants.

### 2. *The Alleged Misconduct*

Marsellis–Warner alleges that on several occasions during the course of their employment, Rabens and Jack Fernandez, in various conspiracies with each other and with Patricia Fernandez, willfully engaged in a pattern of racketeering activity and breached their fiduciary and contractual duties to Marsellis–Warner. Specifically, Marsellis–Warner alleges Rabens and Jack Fernandez submitted numerous falsified documents to Marsellis–Warner during the course of many years. According to Marsellis–Warner, Rabens and Jack Fernandez submitted, by regular mail and/or facsimile transmissions, "fictitious timesheets and/or invoices" to Marsellis–Warner detailing work not actually performed for clients of Marsellis–Warner. *See* Complaint at ¶¶ 1, 13. Instead, it is alleged, the falsified documents disguised various lucrative "side" projects performed secretly for the customers of PAM Co. *Id.* at ¶ 1. These side projects allegedly were performed for the following corporations: Shore Point Bottling Corp., King's Welding, Traffic Lines, Inc., Larsen's Ford, Allstar Tool Rental, The Cabin Restaurant, Metetaconk Golf Course, The Italian–American Club, the Fernandez Residences, Carlton & Bilter Insurance Agency, and various unspecified country clubs, driveways and yards. *See id.* at ¶ 18.

Marsellis–Warner further alleges the fictitious daily work reports falsely represented that workers, equipment, services and/or materials had been utilized by the Defendants for only the clients of Marsellis–Warner. *See id.* at ¶ 14. Marsellis–Warner contends the daily work reports and timesheets do not disclose the Defendants in fact performed numerous side projects for their personal financial gain using the workers, equipment, services and materials of Marsellis–Warner. *See id.* In this manner, the Defendants allegedly effected a scheme to avoid paying for labor and materials for the side projects. *See id.* at ¶ 15.

Marsellis–Warner alleges the Defendants

> individually, and in various conspiracies with each other, engaged in wrongful, fraudulent and otherwise illegal schemes to embezzle and steal monies from [Marsellis–Warner], and to otherwise defraud [Marsellis–Warner], utilizing fictional timesheets and invoices to effectuate said schemes.

*See id.* at ¶ 21. Rabens allegedly compounded the fraudulent activity by writing numerous unauthorized checks out of the checking account of Marsellis–Warner, made payable to "cash" or himself. *See id.* at ¶ 25; Amsterdam Aff. at Exhibit A.

As a result of the conduct and activities of the Defendants, Marsellis–Warner contends it suffered "massive financial injury" and reputational injury. *See* Complaint at ¶ 1. More specifically, Marsellis–Warner alleges it suffered injury and losses in the "hundreds of thousands of dollars." *See id.* at ¶¶ 16, 26, 31, 37, 40, 45, 47, 54, 62, 65, 69, 72. It demands judgment in its favor and against the Defendants for, *inter alia,* compensatory damages, treble damages (RICO claims only), attachment of assets, expedited discovery in aid of attachment and temporary restraints. *See id.* at ¶¶ 16, 17, 18–19, 19–20, 21, 21–22, 23, 26, 26–27, 27, 28.

Marsellis–Warner terminated Rabens effective 30 June 1998. *See* Furst Aff. at Exhibit 2; Complaint at ¶ 11. Jack Fernandez resigned his position with Marsel-

lis–Warner on 23 May 1998. *See* Amsterdam Aff. at ¶ 6.

### 3. *The Criminal Proceedings*

The Complaint also discloses the existence of several pending investigations into the conduct of the Defendants. For instance, Marsellis–Warner alleges "the defendants' actions are the subject of ongoing investigations by the Office of the United States Attorney [ (the "U.S. Attorney") ]." *See* Complaint at ¶ 3. It appears the allegations of Marsellis–Warner sparked a criminal investigation conducted by the U.S. Attorney and a Federal grand jury (the "Grand Jury"). It appears Rabens has been designated a target of the investigation. *See* Furst Aff. at ¶ 4. It also appears various subpoenas have been served, including one served on Due Process Country Club for documents concerning work performed "by or on behalf" of Rabens, Jack and Patricia Fernandez or PAM Co. and for membership dues and information concerning them. *See id.* at Exhibit A.

It appears Sean Quinn, a special agent ("Special Agent Quinn") of the Federal Bureau of Investigation (the "FBI") is investigating the sources of income of Jack and Patricia Fernandez, as well as the alleged use of equipment of Marsellis–Warner without payment. *See* Palma Aff. at ¶ 3. The FBI questioned Jack Fernandez concerning two side jobs allegedly performed at Shore Points Distributors and Larsen Ford. *See* Lomurro Aff. at ¶ 3. It appears Special Agent Quinn advised counsel for Jack Fernandez the criminal investigation included the unauthorized use of

the equipment, labor and materials of Marsellis–Warner. *Id.* at ¶ 6. According to Assistant United States Attorney Alan Leibman ("AUSA Leibman"), the scope of the criminal investigation against the Defendants includes the receipt by Rabens of financial benefits from third parties for work outside the scope of his employment with Marsellis–Warner. *See* Furst Aff. at ¶ 6.

It further appears a grand jury subpoena was served upon PAM Co. and its accountant, demanding personal and corporate financial records covering the last five years. *See* Bonney Aff. at ¶ 9; Lomurro Aff. at ¶ 6.

The U.S. Attorney declined to specify an exact timetable for the conclusion of the pending criminal investigation. *See* Furst Aff. at ¶ 5.

Counsel for the Defendants have recommended their clients invoke the Fifth Amendment privilege against self-incrimination in the instant civil action. *See* Furst Aff. at ¶¶ 9–10; Bonney Aff. at ¶¶ 10–12; Lomurro Aff. at ¶¶ 7–9.

### *Discussion*

#### A. *Prerequisites of Preliminary Injunctive Relief*

In anticipation of final judgment rendered in its favor, Marsellis–Warner seeks a preliminary injunction enjoining the Defendants from dissipating or otherwise disposing of any assets and/or documents. The Preliminary Injunction Application is made pursuant to the New Jersey Racketeering Act, N.J.S.A. 2C:41–4,[5] Rule 65

---

5. Section 2C:41–4(a) contains an affirmative grant of jurisdiction to the Superior Court of New Jersey over acts of racketeering violative of the New Jersey Racketeering Act. It provides, in pertinent part:

The Superior Court, making due provisions for the rights of innocent persons, shall have jurisdiction to prevent and restrain the acts or conduct which constitute violations

of N.J.S.A. 2C:41–2, by issuing appropriate orders, including, but not limited to:

 * * * * * *

(2) Imposing reasonable restrictions on the future activities or investments of any person....

 * * * * * *

(7) Ordering the restitution of any monies unlawfully obtained or retained by any person found to be in violation of N.J.S. 2C:41–2.

N.J.S.A. 2C:41–4(a).

and common law. *See* Preliminary Injunction Moving Brief at 3.

### 1. *Equitable Relief Under Federal and State Racketeering Statutes*

Marsellis–Warner, invoking Section 2C:41–4, contends the New Jersey legislature has recognized the availability of injunctive relief where defendants have ·engaged in a pattern of racketeering activity prohibited under the New Jersey Racketeering Act, N.J.S.A. 2C:41–1 *et seq. See* Preliminary Injunction Moving Brief at 28–29. The Defendants, by contrast, argue a preliminary injunction based upon alleged violations of the Federal RICO statutes, 18 U.S.C. § 1961 *et seq.*,[6] and the New Jersey Racketeering Act, N.J.S.A. 2C:41–1 *et seq.*, is unavailable to private litigants. *See* Preliminary Injunction Opposition Brief at 26.

Section 1964(a) of the RICO statute and Section 2C:41–4(a) of the New Jersey Racketeering Act do not expressly preclude equitable actions by private plaintiffs. *See* 18 U.S.C. § 1964(a); N.J.S.A. 2C:41–4(a). The plain language of Section 1964(a) and Section 2C:41–4(a) appears to accord Federal and State courts the authority to grant equitable relief in appropriate actions. Such authority is not expressly limited to cases brought by the Government.[7] Nevertheless, Section

---

Section 2C:41–4(c) provides a private right of action for violations of the . New Jersey Racketeering Act:

> Any person damaged in his [or her] business or property by reason of a violation of [N.J.S.A.] 2C:41–2 may sue therefor in any appropriate court and shall recover threefold any damages he [or she] sustains and the cost of the suit, including a reasonable attorney's fee, cost of investigation and litigation.

N.J.S.A. 41–4(c). As discussed below, Section 2C:41–4(c), with minor differences, mirrors that of 18 U.S.C. § 1964(c).

6. 18 U.S.C. § 1962 ("Section 1962") of the Federal RICO statute delineates the conduct proscribed by the Act. Section 1962(a) provides, in pertinent part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of any unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a). Section 1962(c) prohibits "a person employed by or associated with any enterprise engaged in . . ., interstate or foreign commerce," from participates in the activities of the enterprise through racketeering. 18 U.S.C. § 1962(c). A "person" is defined as including "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). An "enterprise" is defined as "a group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

The enforcement provisions of RICO are found in 18 U.S.C. § 1964. 18 U.S.C § 1964(a) ("Section 1964(a)"), similar to its State law counterpart, Section 2C:41–4(a), affirmatively grants jurisdiction to the district courts under the Federal RICO statute. It provides:

> The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself [or herself] of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

18 U.S.C. § 1964(a).

18 U.S.C. § 1964(c) ("Section 1964(c)") provides a private right of action for violations of the Federal RICO statute. It reads:

> Any person injured in his businesses or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he [or she] sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c).

7. It is undisputed, indeed it is expressly stated, where an action is brought by the United States Attorney General, pursuant to 18

1964(c) and Section 2C:41–4(c), which grant private parties a cause of action under RICO, are silent as to the availability injunctive relief to private plaintiffs.

This Circuit has not squarely addressed the availability of injunctive relief to private litigants under the RICO statutes.[8] A few district courts in the Circuit, however, have held a private litigant may not seek equitable remedies, namely a preliminary injunction, under either the RICO statute or the New Jersey Racketeering Act. In *Curley v. Cumberland Farms Dairy, Inc.*, 728 F.Supp. 1123, 1136 (D.N.J.1989) (SSB), it was held private injunctive relief was unavailable under both Federal and State anti-racketeering laws. The court, analyzing the legislative history of the RICO statutes, found that Congress explicitly rejected a private injunctive relief provision. *Id.* at 1137. It was reasoned:

> that Congress made an express provision for an equitable remedy in suits brought by the government and simultaneously declined to make a similar provision for private actions carries with it the strong suggestion that no private equitable remedy was intended.

*Id.* at 1137 (citing, *inter alia, Religious Technology Center v. Wollersheim*, 796 F.2d 1076, 1082–83 (9th Cir.), *cert. denied*, 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987)); *see also Johnston Develop-*

*ment Group, Inc. v. Carpenters Local Union No. 1578*, 728 F.Supp. 1142, 1146 (D.N.J.1990) (SSB) ("RICO ... makes no provision for private equitable relief[.]"); *Vietnam Veterans of Am., Inc. v. Guerdon Indus., Inc.*, 644 F.Supp. 951, 961 (D.Del. 1986) (JJF) (dismissing RICO claim of plaintiff to extent it sought injunctive relief, observing Congress repeatedly rejected attempts to amend RICO to provide private injunctive remedies).

The *Curley* court similarly determined the New Jersey Racketeering Act does not provide for injunctive relief in private suits.

> The New Jersey RICO provisions parrot those of the [F]ederal statute. [Section] 2C:41–4(a), like its [F]ederal law counterpart, [Section] 1964(a), contains the affirmative grant of jurisdiction to the Superior Court. That section specifically provides the Superior Court with the power to enter orders providing equitable relief. Although the statute provides for equitable remedies in cases brought by the Attorney General, it does not speak to the availability of injunctive relief in private actions. This suggests that the New Jersey General Assembly, like Congress with respect to [Section] 1964(c), did not intend to provide for injunctive relief.

---

U.S.C. § 1964(b) or by the State of New Jersey, pursuant to N.J.S.A. 2C:41–4(b), equitable relief in the form of a preliminary injunction is obtainable. *See* 18 U.S.C. § 1964(b) (where Attorney General institutes proceedings under the RICO statute, "the court may at any time enter such restraining orders or prohibitions, or take other actions, ... as it shall deem proper"); N.J.S.A. 2C:41–4(b) (where Attorney General institutes proceedings in the New Jersey Superior Court, "the court may at any time enter restraining orders or prohibitions, or take other actions, ... as it shall deem proper").

**8.** The Third Circuit has recognized courts are divided on this issue but has not decided it. *See Northeast Women's Center, Inc. v. McMonagle*, 868 F.2d 1342, 1355 (3d Cir.), *cert. denied*, 493 U.S. 901, 110 S.Ct. 261, 107

L.Ed.2d 210 (1989). In *McMonagle*, a women's health center (the "Center") brought an action against anti-abortion activists (the "defendants") for, *inter alia,* civil violations of RICO and state law trespass. The Circuit held:

> Defendants argue that further injunctive relief cannot be awarded under RICO because injunctive relief is not available to private parties under that statute's civil provisions. This is a question of first impression for this court and remains an open question in most other courts.... At oral argument the Center acknowledged that all the injunctive relief it seeks could be granted under its state law claim of interference with contractual relations, and therefore we will not reach to decide the RICO issue. *Id.*

*Curley,* 728 F.Supp. at 1138 (internal citations and footnotes omitted). The court concluded: "To the extent that the [F]ederal statute does not provide for a private equitable remedy, the New Jersey statute similarly omits such a cause of action." *Id.*

Several other Circuit courts share the conclusions drawn by the *Curley* court with respect to the Federal RICO statute. *See In re Fredeman Litig.,* 843 F.2d 821, 830 (5th Cir.), *reh'g denied,* 847 F.2d 840 (5th Cir.1988); *Religious Technology Center,* 796 F.2d at 1077; *Dan River Inc. v. Icahn,* 701 F.2d 278, 290 (4th Cir.1983). Other courts, however, have concluded RICO affords a private injunctive remedy. *See, e.g., Nat'l Organization for Women, Inc. v. Scheidler,* 897 F.Supp. 1047, 1082–83 (N.D.Ill.1995); *Chambers Development Co. v. Browning–Ferris Indus.,* 590 F.Supp. 1528, 1540 (W.D.Pa.1984) (holding equitable relief is available to private parties in RICO claims, in part because the RICO statute must be liberally construed to effectuate its purpose).

■ A determination of whether equitable relief is available to private plaintiffs under the Federal or State racketeering statutes is, in the instant matter, unnecessary. Irrespective of any statutory grant of authority, a Federal court may, in the exercise of its inherent equity powers, enjoin actionable conduct. *See McMonagle,* 868 F.2d at 1355 (declining to decide whether injunctive relief is available to private parties under the RICO statute because "all the injunctive relief [the plaintiff] seeks could be granted under its state law claim"); *Dixie Carriers, Inc. v. Channel Fueling Serv.,* 843 F.2d 821, 830 (5th Cir.1988) (acknowledging other forms of injunctive relief may not be foreclosed to private plaintiffs suing under RICO statute); *Chambers,* 590 F.Supp. at 1541 (recognizing the inherent power of Federal courts to grant equitable relief to prevent irreparable injury from conduct prohibited by RICO); *Aetna Casualty & Surety Co. v. Liebowitz,* 570 F.Supp. 908, 910

(E.D.N.Y.) (granting preliminary injunction to private RICO litigant after finding traditional standards in that circuit for obtaining preliminary injunctive relief met), *aff'd,* 730 F.2d 905 (2d Cir.1984).

■ Significantly, preliminary injunctive relief remains available under Rule 65 to private plaintiffs who invoke Federal jurisdiction pursuant to the RICO statute. *See* Fed.R.Civ.P. 65; *McMonagle,* 868 F.2d at 1355. Grounds for an injunction may rest independently on meritorious non-RICO Federal claims or pendent State law claims. *See Roe v. Operation Rescue,* 919 F.2d 857, 867 (3d Cir.1990) (citing *McMonagle,* 868 F.2d at 1355) (upholding issuance of injunction which rested independently on pendent State law claims); *see also People by Abrams v. Terry,* 45 F.3d 17, 23 (2d Cir.1995) (citing *Roe,* 919 F.2d at 867) ("[E]ven assuming that [42 U.S.C. § ] 1985(3) does not authorize an injunctive remedy, the injunction can be sustained on the basis of the independent [S]tate law claims."); *Lincoln House, Inc. v. Dupre,* 903 F.2d 845, 848 (1st Cir.1990) (citing, *inter alia, McMonagle,* 868 F.2d at 1355) (stating "it is not clear whether injunctive or other equitable relief is available at all in private civil RICO actions" but expressly declining to exercise inherent power to grant injunctive relief based on facts before it); *Northern Virginia Women's Medical Center v. Balch,* 617 F.2d 1045, 1049 (4th Cir.1980) (sustaining injunction based on pendent State law claims). As discussed below, Marsellis–Warner has alternatively asserted viable non-RICO grounds on which it may secure equitable relief in the instant action.

### 2. Traditional Bases for Equitable Relief

Marsellis–Warner also alleges pendent State law claims of fraud, breach of contract, conversion, conspiracy, unjust enrichment and breach of fiduciary duty. *See* Complaint. As discussed, the Preliminary Injunction Application relies not only on the RICO statute, but also on injunctive

relief afforded by Rule 65 and the common law.

▮ Injunctive relief pursuant to Rule 65 is an extraordinary remedy. When reviewing the Preliminary Injunction Application of Marsellis–Warner, the following four factors (the "Injunction Factors") must be considered:

(1) the likelihood that [Marsellis–Warner] will prevail on the merits at final hearing;

(2) the extent to which [Marsellis–Warner] is being irreparably harmed by the conduct complained of;

(3) the extent to which [the Defendants] will suffer harm if the preliminary injunction is issued; and

(4) the public interest.

*See, e.g., Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 803 (3d Cir.1998); *American Telephone & Telegraph, Co. v. Winback and Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir.), *cert. denied,* 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995); *Gerardi v. Pelullo,* 16 F.3d 1363, 1373 (3d Cir.1994); *S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 375 (3d Cir.1992); *Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 191–92 (3d Cir.1990); *Alessi v. Commonwealth of Pennsylvania, Dep't of Pub. Welfare,* 893 F.2d 1444, 1447 (3d Cir. 1990); *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 799 (3d Cir. 1989); *Fechter v. HMW Indus., Inc.,* 879 F.2d 1111, 1116 (3d Cir.1989); *Jews for Jesus v. Brodsky,* 993 F.Supp. 282, 292 (D.N.J.), *aff'd,* 159 F.3d 1351 (3d Cir.1998); *Genovese Drug Stores, Inc. v. TGC Stores, Inc.,* 939 F.Supp. 340, 343 (D.N.J.1996); *Apollo Technologies v. Centrosphere Indus.,* 805 F.Supp. 1157, 1191 (D.N.J.1992); *Glenside West Corp. v. Exxon Co., U.S.A.,* 761 F.Supp. 1118, 1132 (D.N.J.1991); *CPC Int'l, Inc. v. Caribe Food Distribs.,* 731 F.Supp. 660, 664 (D.N.J.1990); *Bascom Food Prods. Corp. v. Reese Finer Foods, Inc.,* 715 F.Supp. 616, 624 (D.N.J.1989).

▮ The grant or denial of the Preliminary Injunction Application lies within " 'the sound discretion of the district judge, who must balance all of [the Injunction F]actors in making a decision.' " *FM 103.1, Inc. v. Universal Broadcasting of N.Y., Inc.,* 929 F.Supp. 187, 193 (D.N.J. 1996) (citing *Kershner v. Mazurkiewicz,* 670 F.2d 440, 443 (3d Cir.1982) and *Atlantic Coast Demolition v. Board of Chosen Freeholders of Atlantic Cty.,* 893 F.Supp. 301, 307 (D.N.J.1995)); *Brodsky,* 993 F.Supp. at 292.

Of the Injunction Factors, the Circuit has placed particular emphasis on the likelihood of success on the merits and the probability of irreparable harm, stating: " '[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent.' " *Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 197 (3d Cir.1990) (quoting *In re Arthur Treacher's Franchisee Litig.,* 689 F.2d 1137, 1143 (3d Cir. 1982)); *see also Instant Air,* 882 F.2d at 800; *Morton v. Beyer,* 822 F.2d 364, 367 (3d Cir.1987); *Sky Vue,* 759 F.2d at 1098–99; *Freixenet, S.A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 151 (3d Cir. 1984).

Additionally, before a preliminary injunction may issue, the applicant for the injunction usually must give security

in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed.R.Civ.P. 65; *Elliott v. Kiesewetter,* 98 F.3d 47, 59–60 (3d Cir.1996); *In re Nat'l Credit Management Group, L.L.C.,* 21 F.Supp.2d 424, 463 (D.N.J.1998); *Brodsky,* 993 F.Supp. at 293.

a. *Likelihood Marsellis–Warner Will Prevail on the Merits of its Common Law Claims*

▮ For purposes of granting a preliminary injunction on the basis of pendent State law claims, "it is sufficient that [Mar-

sellis–Warner] be found likely to succeed on one of the[ ] common law claims." *Andrews v. Holloway*, No. 95–1047, 1995 WL 875883, at *14 (D.N.J. Nov. 9, 1995). A review of the facts alleged in the Complaint and stated in the affidavits accompanying the Preliminary Injunction Application reveals Marsellis–Warner is likely to succeed on its fraud, breach of fiduciary duty and conversion claims.[9] These claims are addressed seriatim.[10]

### (1) *Fraud*

The first count of the Complaint alleges, *inter alia*, the Defendants "engaged in wrongful, fraudulent and otherwise illegal schemes to embezzle and steal monies from plaintiff, and to otherwise defraud plaintiff, utilizing fictional timesheets and invoices to effectuate said schemes." Complaint at ¶ 21.

Satisfaction of the elements of common law fraud under New Jersey law requires proof the defendant made:

(1) a material representation of a present or past fact (2) with knowledge of its falsity (3) with the intention that the other party rely thereon (4) ... which resulted in reasonable reliance by plaintiff [and (5) which resulted in damages].

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1182 (3d Cir.1993) (citing *Jewish Center v. Whale*, 86 N.J. 619, 624, 432 A.2d 521 (1981)); *see Andrews*, 1995 WL 857883, at *14 (citing *Nappe v. Anschelew-

itz, Barr, Ansell & Bonello*, 97 N.J. 37, 477 A.2d 1224 (1984) (citing *Jewish Center*, 86 N.J. at 624, 432 A.2d 521)); *see Eli Lilly & Co. v. Roussel Corp.*, 23 F.Supp.2d 460, 492 (D.N.J.1998) (applying New Jersey law); *New Jersey Carpenters Health Fund v. Philip Morris, Inc.*, 17 F.Supp.2d 324, 333 (D.N.J.1998) (citing *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610, 691 A.2d 350 (1997) (listing elements)). The elements of legal fraud must be proved by a preponderance of the evidence. *See Lightning Lube*, 4 F.3d at 1183 (citing *Jewish Center*, 86 N.J. at 624, 432 A.2d 521).[11]

It appears, at this preliminary stage of the litigation, Marsellis–Warner will be able to establish a prima facie case of fraud. Marsellis–Warner sets forth in detail the techniques employed by the Defendants. It alleges:

In an effort to conceal the fraud, defendants intentionally camouflaged the 'side' work they were performing through a myriad of veiled techniques, including the preparation of false documents, providing false certifications to payroll submissions, and in destroying documents and/or shielding documents which would have revealed defendants' 'side' projects in various locations where they could not be discovered by [Marsellis–Warner].

\* \* \* \* \* \*

Rabens compounded the fraudulent activity by writing numerous unauthorized checks out of [Marsellis–Warner's]

---

9. No opinion is expressed as to the likelihood of success on the merits of the pendent State law claims not addressed below.

10. In support of the Preliminary Injunction Application, Marsellis–Warner argues, *inter alia:* "Given defendants' serious criminal acts, including their numerous predicate acts of racketeering proscribed under the [RICO] Act, 18 U.S.C. § 1961 *et seq.*, and the New Jersey Racketeering Act, N.J.S.A. 2C:41–1 *et seq.*, there is little doubt that final judgment will be rendered in favor of [Marsellis–Warner]." Preliminary Injunction Moving Brief at 4. Because the Preliminary Injunction Application is upheld on the basis of the pendent State law claims alone, the merits of the Fed-

eral and State RICO claims need not be addressed.

11. Under New Jersey law, an action for fraud may be either legal or equitable in nature. *See Jewish Center*, 86 N.J. at 624, 432 A.2d 521. Equitable fraud does not require demonstration of scienter, but requires proof of the other elements of fraud by clear and convincing evidence. *Id.* Where, however, a plaintiff alleges fraud to recover money damages, the fraud is legal in nature. As such, a plaintiff is held to the preponderance of the evidence standard, and is required to prove the defendant acted with scienter. *Id.; see Lightning Lube*, 4 F.3d at 1153.

checking account made payable to himself and/or 'cash', and utilizing the proceeds of these checks for personal expenses. Further, and as a result of Rabens [sic] fraudulent conduct, [Marsellis–Warner] loaned Rabens several thousands of dollars without security for the same.

Complaint at ¶¶ 22, 25.

The statements of employees of Marsellis–Warner corroborate many of these allegations. Specifically, Mark Bennett ("Bennett"), a laborer with Marsellis–Warner, stated he personally worked on many of the unauthorized side projects of the Defendants, including those projects performed at the Shore Point Bottling Corp., King's Welding, Larsen's Ford, Allstar Tool Rental, The Cabin Restaurant, Metetaconk Golf Course, The Italian–American Club and the Fernandez Residences. *See* Bennett Aff. at ¶ 5. Bennett testified that for these side projects, he, along with full crews of laborers of Marsellis–Warner, worked under the direction of Jack Fernandez. *See id.* At these sites, various trucks, equipment and materials of Marsellis–Warner also were used. *See id.* Andrew Amsterdam, Vice President of Marsellis–Warner confirmed, "not a single project enumerated in paragraph 5 of Mr. Bennet's Affidavit were [sic] legitimate projects contracted for by [Marsellis–Warner]." Amsterdam Aff. at ¶ 3.

Bennett also attested to the alleged fraudulent billing by the Defendants. He stated a daily work report prepared for 22 November 1996 by Jack Fernandez,[12] falsely represented the actual work performed on that particular day. While the daily work report indicated Bennett worked on one of the projects of Marsellis–Warner on that date, Bennett stated he "worked the entire day at the Shore Point Bottling Plant," an alleged side job of the Defendants. Bennett Aff. at ¶ 7.

That Bennett may not be competent to attest to the scope of the job responsibilities of his superiors, as the Defendants contend, *see* Preliminary Injunction Opposition Brief at 3–4, is unavailing. The statements of Bennett are sufficiently limited in scope to describing his personal job assignments under the direction of Jack Fernandez and his personal knowledge of his whereabouts on 22 November 1996.

Statements contained in the Amsterdam Affidavit further support a finding of fraud. Amsterdam stated:

> [Marsellis–Warner] received no income from any of [the side] projects and, until the existence of these projects was recently disclosed to me by Mr. Bennett, [Marsellis–Warner] had absolutely no knowledge of these projects. With respect to all of these projects, defendants submitted fictional timesheets which misrepresented that the manpower, equipment, services and/or materials that defendants were using on their side projects were being used on plaintiff's projects. As a result of these misrepresentations, defendants induced plaintiff to make hundreds of thousands of dollars of unmerited payments.

Amsterdam Aff. at ¶ 3. Amsterdam also stated he recently discovered unauthorized checks payable to "cash" or to Rabens which were drawn on the bank account of Marsellis–Warner. *Id.* at ¶ 8.[13]

The statements of Philip J. Pirro ("Pirro"), Executive Vice President of Marsellis–Warner, are not to the contrary. Upon the commencement of his employment in June 1994, Pirro audited all jobs of Marsellis–Warner. *See* Pirro Aff. at ¶ 2. According to Pirro, an audit of the jobs under the control of Rabens and Jack Fernandez revealed the following suspect activities:

> [S]everal cost. items did not add up on the monthly internal statements. It ap-

---

12. The daily work report of 22 November 1996 is attached as Exhibit A to the Bennett Aff.

13. The front and back copies of various unauthorized checks made payable to "cash" or Rabens are attached as Exhibit A to the Amsterdam Aff.

peared that the trucks were constantly on the South Jersey jobs with little or no resulting value. The truckers included PAM Trucking, Ben Dudling Trucking, Centimole Trucking and Hurley Trucking....

\* \* \* \* \* \* .

My suspicions were further aroused by Rabens's handling of a project at Port Elizabeth, Newark, New Jersey known as the 'Port Triangle' project. The Port Triangle project was subject to unexplained construction overruns and showed little or no profit. The first problem I noticed was when Jack Fernandez was milling the site. We arranged for my foreman Donald Sember to receive the milled asphalt from the Port Triangle project and use it as a subbase on a project for an A & P Supermarket in Kenilworth. When I arrived at the Kenilworth site, I noted that we were receiving very bad, chunky loads of milling that were not good quality .... [Don Sember] reported that the poor quality millings from the Port Triangle project were being sent to Kenilworth while the good millings were trucked offsite to an unknown location. When I questioned Rabens regarding this issue, he stated that the loads of good millings had been sold and advised me not to worry about it. To my knowledge, [Marsellis–Warner] never realized any income from these sales....

*Id.* at ¶¶ 2–3.

It additionally appears Marsellis–Warner undertook reasonable steps to investigate the activities of the Defendants. On the basis of the suspicions of Pirro and Amsterdam concerning the activities of Rabens and Jack Fernandez, Robert Shockley ("Shockley") was hired in February 1998 as a general supervisor to monitor the activities of the South Jersey Of-

fice. *See* Shockley Aff. at ¶ 2.[14] Shockley stated that immediately after assuming his monitoring duties, he encountered hostility from Rabens and Jack Fernandez:

> [I]t became very apparent to me that both Charles Rabens and Jack Fernandez objected to my presence of the various sites where the South Jersey office's projects were located. I was repeatedly informed by laborers and subcontractors that Rabens and Fernandez were annoyed and angered by my presence.

> \*. \* \* ' \* \* \*

> I recall that on one specific occasion, I questioned Rabens regarding the allocation and amount of equipment utilized on one of the projects. Rabens told me abruptly: 'I'll run my job however I want to.' He then flatly refused to answer further questions....

> \* \* \* \* \* \*

> [A]s I continued to probe more deeply into the daily operations of the South Jersey office, Rabens and Fernandez very frequently criticized my job performance to my supervisors, and did everything they could to have me terminated.

*Id.* at ¶¶ 3–5.

The extent and exact nature of the alleged fraud was not uncovered, however, until Bennett came forward. *See* Amsterdam Aff. at ¶ 3. It appears Marsellis–Warner reasonably relied to its detriment on the alleged fraudulent timesheets and invoices and other misstatements. *See id.;* *see also* Complaint at ¶¶ 23–24.

Marsellis–Warner has proffered corroborated evidence of fraud. The affidavits submitted in support of the Preliminary Injunction Application indicate the timesheets submitted by the Defendants fraudulently misrepresented that work was performed on the legitimate projects of Marsellis–Warner. In reality, however,

---

**14.** Contrary to the assertions of the Defendants, it is not significant that David Hocking ("Hocking"), who also interviewed for the same supervisory position, was not similarly told there was a problem with the South Jersey Office. *See* Hocking Decl. at ¶ 4. The Hocking Declaration in no way contradicts or undermines the observations and experiences of Shockley, who was ultimately hired for the position.

it appears the work was for side projects of the Defendants. It further appears Marsellis–Warner, in reliance on these timesheets, paid for expenses, including labor, equipment and materials, all of which were utilized on the side projects. Accordingly, Marsellis–Warner has demonstrated a reasonable likelihood of success on the merits of its common law fraud claim.

### (2) *Breach of Fiduciary Duty*

It also appears Marsellis–Warner is likely to succeed on its claim the Defendants breached their fiduciary duties to Marsellis–Warner. Count seven of the Complaint alleges:

> As a senior officer of [Marsellis–Warner], Rabens owed [Marsellis–Warner] a fiduciary duty of care, which included the duties of good faith, openness, and full disclosure. Similarly, as an employee of [Marsellis–Warner, Jack] Fernandez owed [Marsellis–Warner] a fiduciary duty of care, which included the duties of good faith, openness and full disclosure.

Complaint at ¶ 22. It is contended Rabens and Jack Fernandez nevertheless engaged in numerous acts of fraud, embezzlement and other self-interested transactions at the expense of Marsellis–Warner. *Id.* at ¶ 23.

■ Under New Jersey law, "[a]n employee owes a duty of loyalty to the employer and must not, while employed, act contrary to the employer's interest." *Chernow v. Reyes,* 239 N.J.Super. 201, 204, 570 A.2d 1282 (App.Div.), *cert. denied,* 122 N.J. 184, 584 A.2d 245 (1990); *see Campbell Soup Co. v. ConAgra, Inc.,* 801 F.Supp. 1298, 1308 (D.N.J.1991) (SSB) (citing *Chernow,* 239 N.J.Super. at 204, 570 A.2d 1282 and *Auxton Computer Enterprises v. Parker,* 174 N.J.Super. 418, 423–25, 416 A.2d 952 (App.Div.1980)), *order vacated on other grounds,* 977 F.2d 86 (3d Cir.1992); *Cameco, Inc. v. Gedicke,* 299 N.J.Super. 203, 213–14, 690 A.2d 1051 (App.Div.1997), *aff'd,* 157 N.J. 504, 724 A.2d 783 (1999).

■ During the period of employment, "the employee has a duty not to compete with the employer's business." *Chernow,* 239 N.J.Super. at 204, 570 A.2d 1282 (citing *United Board & Carton Corp. v. Britting,* 63 N.J.Super. 517, 524, 164 A.2d 824 (1959)). The solicitation of customers or potential customers of an employer or comparable competitive acts constitutes a breach of an employee's duty of loyalty. *See Cameco,* 299 N.J.Super. at 214, 690 A.2d 1051; *Auxton Computer Enterprises,* 174 N.J.Super. at 423–24, 416 A.2d 952 ("[An employer] may not solicit his [or her] employer's customers for his [or her] own benefit before he [or she] has terminated his [or her] employment. Nor may he [or she] do other similar acts in direct competition with the employer's business."); *see also Subcarrier Communications, Inc. v. Day,* 299 N.J.Super. 634, 645, 691 A.2d 876 (App.Div.1997) (quoting *Auxton Computer Enterprises,* 174 N.J.Super. at 423–24, 416 A.2d 952).

Marsellis–Warner appears to have alleged conduct constituting a breach of fiduciary duty. Rabens and Jack Fernandez, selected by Marsellis–Warner to manage and oversee the projects of the South Jersey Office, were delegated control over the office without expectation of interference or monitoring on the part of Marsellis–Warner. Consequently, Rabens and Jack Fernandez owed Marsellis–Warner the strictest duty of good faith and loyalty. *See Silverstein v. Last,* 156 N.J.Super. 145, 152, 383 A.2d 718 (App.Div.1978).

It appears, however, Rabens and Jack Fernandez, as fiduciaries, breached their duty of loyalty to their employer. Marsellis–Warner has proffered sufficient evidence indicating the Defendants pursued competitive commercial activities while simultaneously working for Marsellis–Warner. As discussed, Bennett stated he was employed on various side jobs under the direction of Jack Rabens and Jack Fernandez. *See* Bennett Aff. at ¶ 5. According to Pirro, Bennett and Amsterdam, these side

jobs were not reflected in the daily work reports and invoices prepared by the Defendants. It appears the alleged side jobs solicited by the Defendants, if proven to exist, constitute competitive commercial opportunities actionable under New Jersey law. As such, it appears it is likely Marsellis–Warner will prevail on its breach of fiduciary duty claim.[15]

### (3) Conversion

It also appears, at this stage, Marsellis–Warner has stated a claim for conversion. The fourth count of the Complaint alleges, *inter alia*, the conduct of the Defendants constitutes common law conversion. Complaint at ¶ 39.

Common law conversion under New Jersey law is defined as "the exercise of any act of dominion in denial of another's title to ... chattels, or inconsistent with such title." *Mueller v. Technical Devices Corp.*, 8 N.J. 201, 207, 84 A.2d 620 (1951); *see Huffmaster v. Robinson, J.A.*, 221 N.J.Super. 315, 323, 534 A.2d 435 (Law Div.1986) (quoting *Life Ins. Co. of Va. v. Snyder*, 141 N.J.Super. 539, 545, 358 A.2d 859 (App.Div.1976) ("Conversion is 'the wrongful exercise of dominion and control over the property of another in a manner inconsistent with that other person's rights.' "); *see also McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 771 (3d Cir.1990) (citing, *inter alia, Life Ins. Co. of Va.*, 141 N.J.Super. at 545, 358 A.2d 859 and *Mueller*, 8 N.J. at 207, 84 A.2d 620); *Communications Programming, Inc. v. Summit Mfg., Inc.*, No. Civ. A. 98–253, 1998 WL 329265, at *5 (D.N.J. June 16, 1998)(AMW) (citing and applying New Jersey conversion law). Accordingly, the elements of common law conversion under New Jersey law are "[the existence of] property and the right to immediate possession thereof belonging to plaintiff, and

the wrongful interference with that right by defendant." *Andrews*, 1995 WL 875883, at *14 (citing *First Nat'l Bank of Bloomingdale v. North Jersey Trust Co.*, 18 N.J.Misc. 449, 14 A.2d 765 (1940)); *see Huffmaster*, 221 N.J.Super. at 323, 534 A.2d 435; *McAdam*, 896 F.2d at 771 (citing New Jersey conversion law); *Communications Programming, Inc.*, 1998 WL 329265, at *5 (same).

The affidavits submitted by Marsellis–Warner demonstrate a strong likelihood the' Defendants wrongfully exercised control over the property of Marsellis–Warner in a manner inconsistent with the rights of Marsellis–Warner. By virtue of their positions as executive Vice President and foreman, Rabens and Jack Fernandez exercised dominion and control over the South Jersey Office of Marsellis–Warner. It appears they utilized the workers, equipment, services and materials of Marsellis–Warner in performing various side projects, without the consent or knowledge of Marsellis–Warner. In this manner, the Defendants likely depleted the materials and labor of Marsellis–Warner.

Amsterdam cited specific examples in which materials belonging to Marsellis–Warner may have been unlawfully converted by the Defendants. According to Amsterdam, at a project Marsellis–Warner performed for Merrill Lynch in 1997–1998, approximately four thousand cubic yards of millings were generated for subsequent sale by Marsellis–Warner, of which four hundred cubic yards were used on the Merrill Lynch site itself. *See* Supplemental Amsterdam Aff. at ¶ 12. Jack Fernandez, however, only submitted payment to Marsellis–Warner for approximately fifteen hundred cubic yards of millings. The Defendants failed to account for the remaining twenty-one hundred cubic yards of millings. *See id.*[16]

---

**15.** This conclusion need not be reexamined in light of the settlement agreement-in-principal between Marsellis–Warner and Rabens. Rabens and Jack Fernandez, as co-owners of PAM Co. and managers of the South Jersey Office, each appear to be responsible for pursuing competitive commercial activities. A settlement of the claims against Rabens does not affect the liability of Jack Fernandez for his own breach of fiduciary duty.

**16.** The Supplemental Amsterdam Aff. was revised pursuant to the 24 November 1998 Order.

Such conduct, as alleged by Marsellis–Warner and attested to by Bennett, Amsterdam and Pirro, likely rises to the level of unlawful conversion under New Jersey law. As discussed below, the Defendants fail to convincingly rebut many of the allegations of the Marsellis–Warner employees.

### (4) *Sufficiency of Evidence Offered by the Defendants*

The evidence proffered by the Defendants in opposition to the Preliminary Injunction Application is, for the most part, unpersuasive.[17]

Initially, it appears the unnotarized affidavit of a Marsellis–Warner worker, John McSwain ("McSwain"), dated 19 October 1998, was forged.[18] Amsterdam, having observed the signature of McSwain on numerous occasions, attested the signature at the end of the 19 October 1998 McSwain Affidavit is not the signature of McSwain. Amsterdam Supplemental Aff. at ¶ 4. In a notarized affidavit, dated 9 November 1998, submitted by Marsellis–Warner, McSwain stated:

> The October 19, 1998 Affidavit is a complete forgery. I never saw that document before, and the contents of that Affidavit were never discussed with me. I never made any of the statements contained in the October 19, 1998 Affidavit. The signature at the end of the Affidavit is not my signature.

9 November 1998 McSwain Aff. at ¶ 1. As such, the 19 October 1998 Affidavit will not be considered.[19]

The numerous other affidavits submitted on behalf of the Defendants do not introduce any basis for concluding the Defendants will prevail in this action. Notably absent from the affidavits submitted by the Defendants are affidavits of the central characters familiar with the daily operations of the South Jersey Office. The affidavits are instead submitted by peripheral non-parties who do not deny the existence of a fraudulent scheme or the submission of fraudulent daily work reports and invoices by the Defendants. *See, e.g.,* Sandra Rabens Aff.; DiGirolamo Aff.; Assuncao Aff.

The Cackowski Affidavit comes closest to a general denial of any fraud by the Defendants. Cackowski, a shop steward formerly employed by Marsellis–Warner, worked under the direction of Jack Fernandez. Cackowski attempts to explain how the Defendants performed side jobs while still billing more than forty hours a week per laborer to Marsellis–Warner. Cackowski states:

> When work was done in the summer or around holidays, the crews would work four 10 hour days (Monday through Thursday) and the jobs were billed for a forty-hour work week. The laborers

---

**17.** Marsellis–Warner objected to the unnotarized affidavits of Terry Hurley ("Hurley"), Eric Strucke ("Strucke"), Michael DiGirolamo ("DiGirolamo"), Carmen Centimole ("Centimole") and Michael Cackowski ("Cackowski"), originally submitted on behalf of the Defendants on 21 October 1998. *See* Preliminary Injunction Reply Brief at 2–3. These affidavits were "witnessed" by Thomas Beatty, a private detective of the Defendants. *See* 21 October 1998 McGovern Aff. (attaching unnotarized affidavits).

On 23 November 1998, virtually identical notarized affidavits of Hurley, Struck, DiGirolamo, Centimole and Cackowski were submitted. *See* 23 November 1998 McGovern Aff. (attaching notarized affidavits). In light of the 23 November 1998 McGovern Affidavit which remedied any earlier deficiencies, the objections of Marsellis–Warner concerning the five unnotarized affidavits are now moot.

**18.** The 19 October 1998 McSwain Aff. attributed, *inter alia,* the following statements to McSwain: "During my forty years with [Marsellis–Warner] I had talked to Phil Amsterdam many times about the use of Marsellis–Warner equipment for jobs after the working hours. Mr. Amsterdam repeatedly told me that the Marsellis–Warner equipment could be used by myself and Jack Fernandez as long as we had an operator who could run the piece of equipment." 19 October 1998 McSwain Aff. at ¶ 3.

**19.** The matter of the submission of the 19 October 1998 McSwain Affidavit will be sorted out at a later time.

then had the option of working for Jack Fernandez Company [ (PAM Co.) ] on Friday, on Jack Fernandez Payroll [sic]. Many times Mark Bennett and other laborers had the option to work on Friday with Jack Fernandez Company.

Cackowski Aff. at ¶ 3.[20]

The allegations of the Cackowski Affidavit are contradicted by the daily work reports regularly submitted by the Defendants during the relevant time frame. The daily work reports, attached to the Supplemental Amsterdam Affidavit, evidence a different billing practice by the Defendants. These reports indicate during the summer from Monday through Friday, and sometimes Saturday, the Defendants billed approximately eight hour days to Marsellis–Warner. *See* Supplemental Amsterdam Aff. at ¶ 7 and Exhibits B and C (attaching copies of daily work reports submitted by Jack Fernandez for Fridays and Saturdays during the summers of 1995 to 1997).

The affidavit of Strucke and the declaration of Elaine Simone ("Simone"), also submitted by the Defendants, are similarly unpersuasive. Strucke, the president of a cellular telephone company located in Freehold, New Jersey, stated, in relevant part:

I was preparing for the grand opening of my cellular phone company. The parking lot needed to be repaved and I contacted Jack Fernandez.... *Jack Fernandez and his crew did the paving job on Friday, July 7, 1995.* I paid for the work in cash and I saw Jack Fernandez pay his employees from the money I had given to him.... I did not see any equipment from Marsellis–Warner used on the paving of my parking lot.

Strucke Aff. at ¶¶ 4–6 (emphasis added). It appears, however, Marsellis–Warner did not receive any revenue from the paving of the parking lot. The daily work report submitted by Jack Fernandez on 7 July 1995 indicates Jack Fernandez and his crew spent the entire eight hour day performing work at the Fort Monmouth job site of Marsellis–Warner. *See* Supplemental Amsterdam Aff. at ¶ 9 and Exhibit E (attaching a copy of the daily work report of 7 July 1995). It appears all the workers, services, equipment and materials listed in the daily work report for 7 July 1995 were paid for by Marsellis–Warner. *See id.*

The Simone Declaration, submitted by the Defendants with the Defendants' Rebuttal Brief, attempts to undermine the assertions of Pirro. Simone, a controller/bookkeeper employed by Marsellis–Warner, stated:

I was never aware that the cost items of the jobs run by Charles Rabens 'did not add up on the monthly internal statements' as suggested by Phillip Pirro.... Instead, I was always aware that the cost items on the jobs run by Charles Rabens were always justified during the monthly reviews which included the company accountant, Philip Amsterdam and myself.

Simone Decl. at ¶ 5. Notably, Simone may not have been employed during the time in which Pirro prepared his audits of jobs performed by the South Jersey Office. Pirro stated he conducted his audits "[s]hortly after [his] commencement of employment with the company [in June 1994]." Pirro Aff. at ¶ 2. Simone, however, resumed working for Marsellis–Warner on 14 September 1994, after an approximately four month absence. Simone Decl. at ¶¶ 1, 5. Her employment with Marsellis–Warner ended on 5 February 1995. *See id.* Si-

---

20. As mentioned, the Cackowski Affidavit, as well as the Strucke Affidavit and Hurley Affidavits discussed below, were originally submitted on 21 October 1998 with the 21 October 1998 McGovern Affidavit. These affidavits subsequently were notarized and, in some instances, revised. The revised Cackowski Affidavit was submitted on 23 November 1998. *See* 23 November 1998 McGovern Aff. (attaching Cackowski Aff.). Accordingly, only the revised, notarized affidavits submitted with the 23 November 1998 McGovern Affidavit are considered.

mone also did not state she and Pirro worked closely during the four month period in which their employment overlapped. Consequently, her unawareness of any inconsistencies in billing allegedly uncovered by Pirro does not make the statements of Pirro less credible.

Lastly, the Hurley Affidavit, submitted by the Defendants, purports to explain how Marsellis–Warner and the Defendants handled the disposal of the materials used at various project sites. Hurley, an independent truck driver who formerly provided trucking services to Marsellis–Warner, stated, in pertinent part:

> I am aware of how [Marsellis–Warner] disposes of millings. The disposal of millings figures into every job that requires the breaking up or shaving of old asphalt. Hauling old pavement to dispose of it adds to the costs of a job. This also occurs when dirt is taken from a site and it must be disposed of as well.

Hurley Aff. at ¶ 2. Hurley accounts only for those millings he personally removed. As Amsterdam indicated, there were several other projects where millings were removed where Hurley did not provide trucking services. See Supplemental Amsterdam Aff. at ¶ 12. As discussed, it appears at these various other sites, millings used by Jack Fernandez were not accounted for by the Defendants. See id. at ¶ 13.

These affidavits, submitted by the Defendants in opposition to the Preliminary Injunction Application, do not challenge, much more undermine, the existence of a fraudulent billing scheme. Critically, the affidavits do not address the side jobs allegedly performed at, among others, the Metetaconk Golf Course, the Fernandez residences, Larsen Ford and King's Welding yard.[21] As such, the affidavits submitted by the Defendants do not frustrate or in any way alter the likelihood Marsellis–

Warner will prevail on the merits of several of its claims.

b. *Extent to Which Marsellis–Warner Will Suffer Irreparable Injury if a Preliminary Injunction is Not Issued*

 To obtain injunctive relief, a party must make a clear showing of "immediate irreparable injury" or a "presently existing actual threat." *Acierno v. New Castle County*, 40 F.3d 645, 655 (3d Cir. 1994); *see Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir.1995); *Jews for Jesus v. Brodsky*, 993 F.Supp. at 311. The mere risk of irreparable harm or the possibility of a remote future injury is not enough. *See Acierno*, 40 F.3d at 655. The word irreparable "connotes 'that which cannot be repaired, retrieved, put down again [or] atoned for.'" *Id.* at 653. As such, Marsellis–Warner must demonstrate that, absent the issuance of a preliminary injunction, it will suffer harm which cannot be redressed sufficiently following a trial of the matter. *See id.* at 652; *One World Botanicals Ltd. v. Gulf Coast Nutritionals, Inc.*, 987 F.Supp. 317, 336 (D.N.J.1997) (quoting *Instant Air*, 882 F.2d at 801). In other words, the issuance of a preliminary injunction must be the only way to protect Marsellis–Warner from injury or harm. *See id.; see also Opticians*, 920 F.2d at 195 (quoting *Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir.1987)).

 In this regard, where money damages are "capable of ascertainment and award at final judgment ... [and] will fully compensate [the plaintiff] for its losses[,]" a preliminary injunction should not issue. *Instant Air*, 882 F.2d at 801; *see Frank's GMC Truck Center v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988) ("The availability of adequate mone-

---

21. It appears the Sergeant Declaration submitted on behalf of the Defendants addresses the alleged side job performed for Traffic Lines, Inc. Raymond Sergeant ("Sergeant"), president of Traffic Lines, Inc., declared,

"Traffic Lines *never* had a secret contract, or any contract, of any kind, with Charles Rabens or Jack Fernandez for paving or related work at any location." Sergeant Decl. at ¶ 5.

tary damages belies a claim of irreparable injury."). Economic loss does not constitute "irreparable harm." *See Acierno,* 40 F.3d at 652 (quoting *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)).

As evidence of irreparable harm, Marsellis–Warner submitted:

> [The Defendants] have already altered and destroyed business records, and have manufactured [sic] false business records in an attempt to undermine any investigation and/or discovery of their misconduct. There is *every* reason to believe that if a Writ of Attachment and injunctive relief are not issued, ... [the Defendants] will transfer and/or deplete their assets so as to put them out of reach of execution, and will also attempt to destroy virtually every document in their possession which could conceivably be used against them.

Preliminary Injunction Moving Brief at 3–4 (emphasis in original).

It appears from the affidavits submitted by Marsellis–Warner the Defendants have already engaged in repeated acts of secreting, removing and/or destroying business records and documentation which may contain evidence implicating them in illegal or unauthorized activities. Amsterdam stated:

> Earlier this year, I was informed by a representative of Assuncao Brothers, a contractor frequently retained by [Marsellis–Warner], that Assuncao Brothers had poured two concrete slabs at the Shore Point Bottling plant (one of defendants' side jobs) at [Jack] Fernandez's request. When I inspected the files at the South Jersey office, I discovered a receipt prepared by Rabens or [Jack] Fernandez which misrepresented that the two slabs were poured for Dow Jones, one of [Marsellis–Warner's] legitimate customers. I set the document

aside to be copied. However, when I returned to the office subsequently to pick up a copy of the document, it had disappeared.

Furthermore, shortly after [Jack] Fernandez quit his employment with [Marsellis–Warner] in late May 1998, I visited [Marsellis–Warner's] South Jersey office in order to investigate certain problems which had been reported with respect to the jobs performed out of [Marsellis–Warner's] South Jersey office. I observed that someone had removed all of the business records pertaining to South Jersey office jobs, which were previously contained in Rabens' personal office, to an unknown location. The disappearance of these documents was never explained by Rabens.

Moreover, in early July, 1998, I scheduled a meeting with Rabens at the South Jersey office. The evening before the scheduled meeting, I paid an unexpected visit to the South Jersey office when neither Rabens nor his staff were [sic] there. I observed that: (1) all business records had been removed, (2) two computers containing numerous documents pertaining to the South Jersey office on their hard drives had been removed, and (3) a large copy machine that I did not recognize as being the property of [Marsellis–Warner] was present on the premises. The very next day, when I arrived at the South Jersey office to attend the scheduled meeting, I discovered that the unfamiliar copy machine had disappeared and the computers and the business records for the South Jersey office had been returned. I was informed by Rabens's staff that the hard drives for both computers had mysteriously 'broken' at the exact same time.

Amsterdam Aff. at ¶¶ 5–7.[22] These statements are substantially corroborated by

22. Amsterdam subsequently admitted the meeting with Rabens actually took place on 27 May 1998, and the visit to the South Jersey Office the previous night occurred on 26 May

1998. *See* Supplemental Amsterdam Aff. at ¶ 17. In this regard, the affidavit of Sandra Rabens, describing the attendance of Rabens and herself at various weddings and vacation

Adeel Malik ("Malik"), an estimator for Marsellis–Warner who occasionally used computer equipment at the South Jersey Office. Malik stated:

> On the night of Tuesday, May 26, 1998, Andrew Amsterdam, Rob Shockley, Rebecca Kilduff and I met at the South Jersey office at 8:00 p.m. I was present to perform a backup of the computer so as to have a copy of all correspondence for the projects handled by the South Jersey office. When we arrived at the office we noticed that the two computers used by defendant Charles Rabens and his secretary, Susan McGowan, were missing, although the computer in Robert McGreevy's office was still there. This came as a shock to me, because these computers, to my knowledge, were never taken out of the office.
>
> In addition, Andrew Amsterdam expressed surprise to see a new photocopier in the office. During my previous visits to [the South Jersey Office], I had noticed that this photocopier had been there before. Later, we found the old photocopier in a cabinet in the storage room of the office.
>
> Furthermore, in our search for files, we opened the drawers of all filing cabinets. In Rabens's room there were empty pendaflexes that were labeled with tabs, however, there were no files in the pendaflexes. The same was the case with the filing cabinet in the main room, under the fax machine. We left the office at 8:30 p.m.
>
> During my previous visits to the South Jersey office, I had noticed that the files were always present in their respective drawers and that all three computers were always present.

Malik Aff. at ¶¶ 3–6.

Shockley, who also was present at the South Jersey Office on the evening of 26 May 1998, further corroborates these versions of the events. He stated:

> [O]n May 26, 1998, Andrew Amsterdam, Adeel Malik, Rebecca Kilduff and I met at the South Jersey office at approximately 8:00 p.m. When we entered the office, we immediately noticed a new photocopy machine. We then inspected the filing cabinets and discovered that all of the office files were missing from the pendaflex sleeves. In addition, two of the three computers in the office were missing.
>
> The next morning, Philip Amsterdam, Andrew Amsterdam, Philip Pirro and I attended a meeting at the South Jersey office with Charles Rabens. Immediately upon entering the office, I noticed that the new photocopy machine was missing and the old photocopy machine had been returned to its place. I also noticed that all three computers were present in the office. During the meeting, Phil Amsterdam asked to see a particular file and when Rabens opened the filing cabinet, we could see that all of the files had been returned to their pendaflex sleeves.

Shockley Aff. at ¶¶ 6–7.

Significantly, the Defendants have not submitted any affidavits indicating they did not engage in financial manipulation or destroy potentially incriminating business records and documentation of work performed out of the South Jersey Office.[23]

---

lodgings from 26 June 1998 to 4 July 1998, *see* Sandra Rabens Aff., is of no consequence. Notably, neither Sandra Rabens nor any of the affiants for the Defendants denied the meeting discussed in the Amsterdam Affidavit occurred.

**23.** The McCreevy Affidavit and subsequent McGreevy Declaration submitted in opposition to the Preliminary Injunction Application do not undercut the corroborated statements of Amsterdam, Malik or Shockley.

McGreevy, a former employee in the South Jersey Office, observed Rabens "was never secretive in his work." McGreevy Decl. at ¶ 3. He declared, "I was never aware that all the files in Mr. Rabens [sic] office were removed and replaced overnight, nor did anyone mention this to me." *Id.* at ¶ 2. McGreevy did not testify to being present at the South Jersey Office on the evening of 26 May 1998 or at any time that night, where it was allegedly discovered certain files and cer-

The Defendants also have failed to demonstrate they are not predisposed to further destroy, hide or manipulate assets unrelated to the underlying litigation. Based on the evidence submitted, it appears defendants are untrustworthy. The likely future dissipation and transfer by the Defendants of otherwise recoverable assets would render a judgment in favor of Marsellis–Warner meaningless.

 In this regard, a money judgment which is uncollectible is not an adequate remedy at law. The " 'fact that the payment of monies is involved does not automatically preclude a finding of irreparable injury.' " *Andrews*, 1995 WL 875883, at *11 (quoting *United Steelworkers of Am. v. Fort Pitt Steel Casting*, 598 F.2d 1273, 1280 (3d Cir.1979)). This Circuit has recognized the " 'unsatisfiability of a money judgment can constitute irreparable injury.' " *Gerardi*, 16 F.3d at 1373 (quoting *Hoxworth*, 903 F.2d at 205–06). In *Hoxworth*, 903 F.2d 186,[24] the court held:

> [T]he injunction was a reasonable measure to preserve the status quo pending final determination of the questions raised by the bill.... As already stated, there were allegations that [the defendant seller] was insolvent and its assets in danger of dissipation or depletion. This being so, the legal remedy against [the defendant seller], without recourse to the fund in the hands of [the third party], would be inadequate.

*Id.* at 196; *see Kiesewetter*, 98 F.3d at 57–58 (upholding asset freeze "where the very assets subject to a potential judgment will likely be dissipated without entry of the order"); *Gerardi v. Pelullo*, 16 F.3d 1363, 1373–74 (3d Cir.1994) (upholding preliminary injunction restraining transfers of assets unrelated to the underlying litigation where defendants were financially unstable). Defendants who have engaged in "past financial manipulations" create a "substantial and real risk ... that funds would be unavailable to satisfy a reasonably foreseeable judgment in plaintiffs' favor." *Andrews*, 1995 WL 875883, at *11.

The Defendants argued that unlike the situation in *Hoxworth*, the Defendants in the instant case are unsophisticated in financial matters. *See* Preliminary Injunction Opposition Brief at 28–29. They asserted they no longer maintain control over the enterprise they are alleged to have used to perpetrate fraud. *Id.* at 29. Because they are no longer employees of Marsellis–Warner, the Defendants argued, there exists no threat of continuing harm. *Id.*

These arguments are unconvincing, however, in light of the affidavits of Amsterdam, Shockley and Malik, which evidence the suspect behavior and untrustworthy character of the Defendants. That the Defendants are no longer in control of the South Jersey Office or employed by Marsellis–Warner is of no moment. A substantial risk remains Jack and Patricia Fernandez will dissipate or otherwise dispose of assets still in their possession or unrelated to their employment with Marsellis–Warner. As stated, the Defendants have not submitted any affidavits contradicting these assertions, or indicating they are not predisposed to further transfer or dissipate their own assets.[25]

---

tain computers were missing and subsequently returned. *See id.* He did not state with any certainty such files and equipment were never removed and replaced; he merely stated he was not made aware of such actions.

**24.** *Hoxworth* involved a class action brought by investors (the "plaintiff buyers") against a securities firm (the "defendant seller"). The plaintiff buyers alleged the defendant seller engaged in securities fraud and civil RICO violations in connection with the sale of penny stocks. The district court entered a pre-

liminary injunction which, *inter alia*, prohibited the defendant seller from transferring any funds outside the ordinary course of business. The Third Circuit upheld the preliminary injunction, rejecting the argument by the defendant seller that the district court lacked the power to issue a preliminary injunction to protect a potential future damages remedy.

**25.** That Rabens may dissipate or otherwise dispose of his assets to avoid a future monetary judgment in favor of Marsellis–Warner is no longer a risk to Marsellis–Warner. As

In this case, a preliminary injunction " 'is reasonably necessary to preserve the status quo, and thus to ensure the satisfaction of a potential future judgment ordering the transfer of money from [the Defendants] to [Marsellis–Warner.]' " *Gerardi*, 16 F.3d at 1373–74 (quoting *Hoxworth*, 903 F.2d at 196). Marsellis–Warner has made a sufficient showing the damages award they will likely be entitled to is in jeopardy. In point of fact, the past financial manipulation of the Defendants and the potential future depletion or dissipation of assets still in the possession of the Defendants create a real and substantial risk money damages may ultimately be unobtainable. *See Andrews*, 1995 WL 875883, at *11 (citing *Hoxworth*, 903 F.2d 186). A preliminary injunction is necessary to preserve a future damages remedy against Jack and Patricia Fernandez. Irreparable injury, therefore, is established.

### c. Extent to Which the Defendants Will Suffer Irreparable Harm if a Preliminary Injunction is Issued

As discussed, in determining whether to grant a preliminary injunction, the extent to which the Defendants will suffer irreparable harm also must be considered. *Pappan*, 143 F.3d at 805; *Gerardi*, 16 F.3d at 1374; *Brodsky*, 993 F.Supp. at 312. "In considering this harm, the district court must undertake to balance the hardships to the respective parties." *Pappan*, 143 F.3d at 805 (citing *Opticians*, 920 F.2d at 197). Balancing the equities, it appears the issuance of an injunction will not harm the Defendants more than a denial would harm Marsellis–Warner. *See id.*

The Defendants have not submitted any affidavits or otherwise demonstrated they will suffer any harm if they are enjoined from further dissipation of assets in their possession. *See Gerardi*, 16 F.3d at 1374 (upholding issuance of preliminary injunction where defendants "have not proffered

significant evidence regarding any substantial harm they might suffer from the preliminary injunction"). The Defendants merely argue the injury to *Marsellis–Warner* is not irreparable. *See* Preliminary Injunction Opposition Brief at 26–30.

In any event, the Defendants may not complain they will suffer irreparable injury if a preliminary injunction is issued. As explained in more detail, the Preliminary Injunction Application is narrowly tailored to protect Marsellis–Warner while imposing a minimal burden on Jack and Patricia Fernandez. Marsellis–Warner merely is seeking to protect the status quo; the conduct of the Defendants is not otherwise limited.

It appears, moreover, "any difficulties [Jack and Patricia Fernandez] now face[ ] were brought on by [their] own conduct." *Pappan*, 143 F.3d at 805. The suspect dealings and untrustworthiness exhibited by the Defendants created a substantial risk to Marsellis–Warner best assuaged through injunctive relief. Any injury Jack and Patricia Fernandez may suffer as a result of the issuance of a preliminary injunction is outweighed by the irreparable harm Marsellis–Warner will suffer if Jack and Patricia Fernandez are not enjoined from further depleting their assets. As such, the balance of equities favors Marsellis–Warner. This factor also supports the issuance of a preliminary injunction.

### d. Extent to Which the Public Interest Favors the Issuance of a Preliminary Injunction to Marsellis–Warner

Finally, it must be determined whether the issuance of a preliminary injunction serves the public interest. *Pappan*, 143 F.3d at 807; *American Telephone & Telegraph Co.*, 42 F.3d at 1427. Where a party demonstrates both the likelihood of success on the merits and irreparable injury, "it almost always will be the case that

discussed, it appears Rabens and Marsellis–Warner have reached a financial settlement. The remaining threat to a potential future

damages remedy posed by Jack and Patricia Fernandez, however, independently warrants injunctive relief.

the public interest will favor" the issuance of an injunction. *American Telephone & Telegraph Co.*, 42 F.3d at 1427 n. 8; *see Brodsky*, 993 F.Supp. at 312. The issuance of a preliminary injunction in the instant matter clearly serves the public interest in preserving the strict fiduciary duty owed employers by employees. Injunctive relief of this sort helps to insulate employers from further acts of financial manipulation, fraud or embezzlement by their employees and protects third party clients of the employer who may be indirectly affected by the fraud.

e. *Scope of Injunction*

██ Before imposing a preliminary injunction encumbering the assets of a defendant to protect a future money judgment, a "court must make some attempt reasonably to relate the value of the assets encumbered to the likely value of the expected judgment." *Hoxworth*, 903 F.2d at 198. This Circuit has identified problems stemming from the issuance of extremely broad preliminary injunctions. For instance, where the claims of plaintiffs "[are] worth, at most $25,000, then a preliminary injunction encumbering well over $10 million of assets to protect the likely judgment obviously would involve funds that could not 'be[ ] the subject of the provisions of any final decree.'" *Id.* (quoting *De Beers Consolidated Mines v. United States*, 325 U.S. 212, 220, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945)).

The exact value of the assets of Jack and Patricia Fernandez is unclear from the submissions of the parties. Significantly, it appears the Defendants have refused to produce their personal financial records in response to the document request of Marsellis–Warner. *See* Supplemental Amsterdam Aff. at ¶ 23. Under other circumstances, further pre-judgment asset discovery may be necessary to reveal the location and existence of unknown assets. In the instant case, however, a Dis-

covery Stay has been imposed pending resolution of the Motion to Stay, discussed below. *See* 11 January 1999 Order.[26]

Even without the benefit of further discovery of the assets of the Defendants, it appears the preliminary injunction sought by Marsellis–Warner represents a reasonable encumbrance. The damages alleged by Marsellis–Warner appear to be reasonably calculated. According to Amsterdam, the damages incurred by Marsellis–Warner as a result of the actions of the Defendants are at least $235,274.40. *See* Supplemental Amsterdam Aff. at ¶ 23 and Exhibit I, attached thereto. In calculating damages, Marsellis–Warner details the specific equipment and workers used at individual project sites, the hours spent working and the costs incurred in connection therewith. *See* Supplemental Amsterdam Aff. at Exhibit I.

The concerns expressed in *Hoxworth* are not present here. The Defendants are not a large securities firm potentially subject to the claims of a class of creditors. Marsellis–Warner is not alleging the Defendants are in possession of millions of dollars in assets; rather, it simply is trying to protect a future monetary judgment in the realm of approximately only $235,000. As such, any discrepancy between the value of the expected judgment and the assets likely encumbered will not be of such an unreasonable nature so as to preclude the issuance of injunctive relief. *See Gerardi*, 16 F.3d at 1373 n. 18 (where expected judgment was in excess of $1,700,000, preliminary injunction prohibiting defendants from dissipating $1,500,000 of potential litigation recovery deemed reasonable); *see also Hoxworth*, 903 F.2d at 199 (at preliminary stages of litigation, a district court need not "make an extended effort to match the value of assets encumbered to the expected value of the judgment dollar for dollar").

---

**26.** In light of the 11 January 1999 Order, the related request of Marsellis–Warner for expe-

dited discovery in which to ascertain the assets of the Defendants is denied as moot.

**534**

Accordingly, the Preliminary Injunction Application, insofar as it seeks the encumbrance of no more than $250,000 worth of assets of the Defendants, is granted. As described in the accompanying order, the Defendants are enjoined from concealing, converting, selling, transferring or otherwise dissipating any assets, including cash, stocks, bonds, other personalty or realty, in which they have an ownership, legal or beneficial interest, which may be subject to an approximately $250,000 monetary judgment rendered in favor of Marsellis–Warner. The Defendants are further prohibited from transferring any funds outside the ordinary course of business and from transferring any funds outside the country without prior approval of the court. Additionally, the prohibition against the destruction of business records or documents relevant to the instant action set forth in the 22 September 1998 Order to Show Cause remains in effect.

### f. Bond Requirement

■ As mentioned, before a preliminary injunction may be issued, the applicant for the injunction usually must give security

> in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed.R.Civ.Pro. 65(c) ("Rule 65(c)"); *Kiesewetter*, 98 F.3d at 59–60 (stating security must be given unless balance of equities weighs overwhelmingly in favor of party seeking injunction and then district court has discretion to waive Rule 65(c) bond requirement after proper finding).

The Third Circuit has strictly interpreted the bond requirement. *See Kiesewetter*, 98 F.3d at 59; *Waterfront Comm'n of N.Y. Harbor v. Construction & Marine Equip. Co.*, 928 F.Supp. 1388, 1405 (citing *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 210 (3d Cir.1990)). The *Hoxworth* court observed:

Although the amount of the bond is left to the discretion of the court, the posting requirement is much less discretionary. While there are exceptions, the instances in which a bond may be required are so rare that the requirement is almost mandatory. We have previously held that absent circumstances where there is no risk of monetary loss to the defendant, the failure of a district court to require a successful applicant to post a bond constitutes reversible error.

903 F.2d at 210; *see Nat'l Credit Management*, 21 F.Supp.2d at 463–64; *Waterfront Comm'n of N.Y. Harbor*, 928 F.Supp. at 1405. The issuance of an improper interlocutory order "may harm the defendant and a bond provides a fund to use to compensate incorrectly enjoined defendants." *Instant Air Freight Co.*, 882 F.2d at 804; *see Nat'l Credit Management*, 21 F.Supp.2d at 464; *Waterfront Comm'n of N.Y. Harbor*, 928 F.Supp. at 1405. The bond requirement also "deters rash applications for interlocutory orders; the bond premium and the chance of liability on it cause plaintiff to think carefully beforehand." *Instant Air Freight Co.*, 882 F.2d at 804; *see Nat'l Credit Management*, 21 F.Supp.2d at 464.

■ The protection afforded by the imposition of a bond offers an otherwise unavailable avenue of recovery to an enjoined defendant. Generally, with rare exceptions, a defendant wrongfully enjoined only has recourse against the bond. As the Supreme Court has observed: "A party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond." *Waterfront Comm'n of N.Y. Harbor*, 928 F.Supp. at 1405 (quoting *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum and Plastic Workers*, 461 U.S. 757, 770 n. 14, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983)); *see also Kiesewetter*, 98 F.3d at 59. Because a preliminary injunction is granted before a trial is held on the merits, the possibility it was incorrectly imposed is a

reality. *See Clark v. K–Mart Corp.*, 979 F.2d 965, 968 (3d Cir.1992); *Nat'l Credit Management*, 21 F.Supp.2d at 464; *Waterfront Comm'n of N.Y. Harbor*, 928 F.Supp. at 1405.

■ As indicated, in *Hoxworth*, this Circuit observed, "[w]hile there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory." 903 F.2d at 210. This strict reading of Rule 65(c) notwithstanding, there may be instances in which a strict reading of the Rule 65(c) is inappropriate.

In *Temple University v. White*, 941 F.2d 201 (3d Cir.1991), *cert. denied sub nom.* 502 U.S. 1032, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992), the Circuit recognized an exception to the bond requirement pursuant to Rule 65(c). *See id.* at 219. Relying upon an approach utilized by the First Circuit, the court in *Temple University* determined, "at least in noncommercial cases, the court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant." *Id.* (quotation omitted); *see Kiesewetter*, 98 F.3d at 59–60 (quoting *Temple University*, 941 F.2d at 219); *Waterfront Comm'n of N.Y. Harbor*, 928 F.Supp. at 1405.

The exception proffered in *Temple University* involves a balance of the equities of the potential hardships that each litigant would suffer as a result of the imposition of a preliminary injunction. *See Kiesewetter*, 98 F.3d at 60. When the balance of these equities overwhelmingly favors the party seeking the injunction, a district court has the discretion to waive the Rule 65(c) bond requirement. *See id.*

The scope of the possible loss to Marsellis–Warner appears to exceed $235,274.40. *See* Supplemental Amsterdam Aff. at ¶ 23. Marsellis–Warner believes, however, its actual losses are significantly higher, but have not yet been uncovered. *See id.*

■ Applying the above principles to the instant case, it appears Marsellis–Warner should not be exempted from the bond requirement. Marsellis–Warner does not appear to be an impecunious party. Accordingly, there appears no reason why Marsellis–Warner cannot set aside adequate revenues to satisfy a bond requirement in the instant matter. No economic hardship or duress will be imposed upon Marsellis–Warner by the imposition of a bond.

The computation of the bond amount may be set "in such sum as the court deems proper." Fed.R.Civ.P. 65(c); *see Hoxworth*, 903 F.2d at 210; *Nat'l Credit Management*, 21 F.Supp.2d at 465; *Waterfront Comm'n of N.Y. Harbor*, 928 F.Supp. at 1405; *see also Maryland Dep't of Human Resources v. United States Dep't of Agriculture*, 976 F.2d 1462, 1483 (4th Cir. 1992). Under the circumstances existing in this case, a large bond is necessary to protect the Defendants against the possibility they are later determined to have been erroneously enjoined. In this regard, a bond of no less than $250,000.00 will suffice.

*B. Standard for a Writ of Attachment*

Marsellis–Warner also seeks an order authorizing the issuance of a writ of attachment against the assets of the Defendants located in New Jersey, pursuant to Section 2A:26–2 [27] and Rule 64.[28] *See* Preliminary Injunction Moving Brief at 3.

---

**27.** Pursuant to Section 2A:26–2(a), an attachment may issue "[w]here the facts would entitle plaintiff to an order of arrest before judgment in a civil action[.]" N.J.S.A. 2A:26–2(a).

**28.** Rule 64, governing the seizure of property, provides, in pertinent part:
[A]ll remedies providing for seizure of person or property for the purpose of securing

satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held, existing at the time the remedy is sought.... The remedies thus available include arrest, attachment, garnishment, replevin, sequestration, and other

State law governs an application for a writ of attachment. Fed.R.Civ.P. 64. Pursuant to N.J.S.A. 4:60–5(a) ("Rule 4:60–5(a)"), a writ of attachment may issue where:

> (1) there is a probability that final judgment will be rendered in favor of the plaintiff; (2) there are statutory grounds for issuance of the writ; and (3) there is real or personal property of the defendant at a specific location within this State with is subject to attachment.

N.J.S.A. 4:60–5(a).

The purpose of a writ of attachment is "for the collection of an ordinary debt by seizure of the property of the debtor." *Wolfson v. Bonello*, 270 N.J.Super. 274, 289, 637 A.2d 173 (App.Div.1994). As such, a writ of attachment is an extraordinary remedy. *Id.* (quoting *Russell v. Fred G. Pohl, Co.*, 7 N.J. 32, 39, 80 A.2d 191 (1951)). Applications for attachment must be construed accordingly. *Id.* at 290, 637 A.2d 173.

Such an analysis pursuant to Rule 64 and the relevant State law is not required in the instant case. It appears a preliminary injunction effectively freezing the assets of the Defendants renders a writ of attachment redundant, and the relief afforded Marsellis–Warner duplicative. This Circuit has applied the preliminary injunction standards under Rule 65 in evaluating a request for injunctive relief which is akin to a request for pre-judgment attachment. *See Hoxworth*, 903 F.2d 186 (applying Rule 65 rather than Rule 64 standards where requested injunctive relief was in the form of an asset freeze to protect a potential future damages remedy).

It appears, therefore, Rule 64 is not the only procedural mechanism which may be used to prevent a litigant from concealing or transferring assets to prevent satisfaction of a potential monetary judgment. As discussed in the preceding sections, assets of defendants unrelated to the underlying litigation may be frozen when money damages are requested. *See, e.g., id.*

The Second Circuit, adopting the reasoning of the Third Circuit in *Hoxworth*, more directly addressed the interplay between Rule 64 and Rule 65. *Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 143 F.3d 688 (2d Cir.), *cert. granted*, —— U.S. ——, 119 S.Ct. 537, 142 L.Ed.2d 447 (1998), involved the sale of notes to United States investment funds (the plaintiffs) by a Mexican holding company (the defendant). Years later, when the defendant defaulted on the notes, the plaintiffs caused the acceleration of the principal. Because the defendant owed more than $450 million to other creditors, the plaintiffs sought damages and a preliminary injunction restraining the defendants from assigning notes issued by the Mexican government to settle its obligations to other creditors. The district court granted a preliminary injunction preventing the defendant from dissipating, transferring, conveying or otherwise encumbering the rights of the plaintiffs to receive benefit from the notes. The Second Circuit, relying on Rule 65, affirmed the issuance of the preliminary injunction.

On appeal to the Second Circuit, the defendant argued Rule 64 is the only procedural mechanism by which to prevent a litigant from concealing or dissipating assets to prevent satisfaction of a potential judgment. The defendant further argued, and the court agreed, prejudgment attachment under Rule 64 was unavailable because the notes in issue were not located in New York. *Id.* at 693.

The court nevertheless exercised its inherent equity power under Rule 65 to freeze the assets of the defendant, including those not directly involved in the litigation. Interpreting Supreme Court precedent, the Second Circuit held the district court had the authority to issue a prelimi-

---

corresponding or equivalent remedies, however designated[.]

Fed.R.Civ.P. 64.

nary injunction to protect the right of the plaintiffs to recover monetary damages in light of the threat of dissipation of assets not directly involved in the pending litigation. *See id.* at 696 (observing the Supreme Court in *De Beers,* 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566, *Deckert v. Indep. Shares Corp.,* 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940) and *United States v. First Nat'l City Bank,* 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965) broadly construed the power of a district court to grant injunctive relief).

*Alliance* stands for the proposition that where prejudgment attachment pursuant to Rule 64 is not possible, a preliminary injunction freezing the assets of the defendant provides an adequate means of protecting a potential future damages judgment. *See id.; see also Local 397, Int'l Union of Electronic, Elec., Salaried, Mach. & Furniture Workers v. Midwest Fasteners, Inc.,* 763 F.Supp. 78, 82 (D.N.J. 1990) (CSF) (citing *Hoxworth,* 903 F.2d at 197) (stating plaintiff union was not required to seek a writ of attachment in light of authority of the district court to issue a preliminary injunction seizing assets to protect potential future damages remedy). In the instant case, injunctive relief pursuant to Rule 65 is sufficient. A preliminary injunction under Rule 65 adequately freezes the assets of the Defendants. A writ of attachment pursuant to Rule 64, even if found to be available under New Jersey law, is nevertheless unnecessary.

*Conclusion*

For the reasons stated, the Preliminary Injunction Application is granted. The Attachment Request of Marsellis–Warner is denied. The Motion to Stay is denied without prejudice with leave to refile for the reasons expressed on the record during the 23 February 1999 Hearing.